# SAINT FRANCIS COLLEGE ET AL. *v.* AL-KHAZRAJI, AKA ALLAN

No. 85–2169.   Argued February 25, 1987—Decided May 18, 1987

WHITE, J., delivered the opinion for a unanimous Court. BRENNAN, J., filed a concurring opinion, *post*, p. 614.

*Nick S. Fisfis* argued the cause and filed a brief for petitioners.

*Caroline Mitchell* argued the cause for respondent. With her on the brief were *Julius LeVonne Chambers* and *Eric Schnapper.**

---

*Robert E. Williams* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American-Arab Anti-Discrimination Committee by *James G. Abourezk;* for the Anti-Defamation League of B'nai B'rith et al. by *Gregg H. Levy, Mitchell F. Dolin, Meyer Eisenberg, David Brody, Edward N. Leavy, Steven M. Freeman, Jill L. Kahn, Robert S. Rifkind, Samuel Rabinove, Richard T. Foltin, Eileen Kaufman, Harold R. Tyler, James Robertson, Norman Redlich, William L. Robinson, Judith A. Winston, Joseph A. Morris,* and *Grover G. Hankins;* and for the Mexican American Legal Defense and Educational Fund et al. by *Barry Sullivan, William D. Snapp, Antonia Hernandez, E. Richard Larson,* and *Kenneth Kimerling.*

Justice White delivered the opinion of the Court.

Respondent, a citizen of the United States born in Iraq, was an associate professor at St. Francis College, one of the petitioners here. In January 1978, he applied for tenure; the Board of Trustees denied his request on February 23, 1978. He accepted a 1-year, nonrenewable contract and sought administrative reconsideration of the tenure decision, which was denied on February 6, 1979. He worked his last day at the college on May 26, 1979. In June 1979, he filed complaints with the Pennsylvania Human Relations Commission and the Equal Employment Opportunities Commission. The state agency dismissed his claim and the EEOC issued a right-to-sue letter on August 6, 1980.

On October 30, 1980, respondent filed a *pro se* complaint in the District Court alleging a violation of Title VII of the Civil Rights Act of 1964 and claiming discrimination based on national origin, religion, and/or race. Amended complaints were filed, adding claims under 42 U. S. C. §§ 1981, 1983, 1985(3), 1986, and state law. The District Court dismissed the §§ 1986 and 1985(3) and Title VII claims as untimely but held that the §§ 1981 and 1983 claims were not barred by the Pennsylvania 6-year statute of limitations. The court at that time also ruled that because the complaint alleged denial of tenure because respondent was of the Arabian race, an action under § 1981 could be maintained. Defendants' motion for summary judgment came up before a different judge, who construed the pleadings as asserting only discrimination on the basis of national origin and religion, which § 1981 did not cover. Even if racial discrimination was deemed to have been alleged, the District Court ruled that § 1981 does not reach claims of discrimination based on Arabian ancestry.[1]

The Court of Appeals rejected petitioners' claim that the § 1981 claim had not been timely filed. Under the Court of Appeals' holding in *Goodman* v. *Lukens Steel Co.*, 777 F. 2d

---

[1] The § 1983 claim was dismissed for want of state action. The pendent state claims were also dismissed.

113 (1985), that the Pennsylvania 2-year statute of limitations governed § 1981 cases, respondent's suit would have been barred. The Court of Appeals, however, relying on *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971), held that *Goodman* should not be retroactively applied and that this suit was timely under its pre-*Goodman* cases which had borrowed the State's 6-year statute.

Reaching the merits, the Court of Appeals held that respondent had alleged discrimination based on race and that although under current racial classifications Arabs are Caucasians, respondent could maintain his § 1981 claim.[2] Congress, when it passed what is now § 1981, had not limited its protections to those who today would be considered members of a race different from the race of the defendant. Rather, the legislative history of the section indicated that Congress intended to embrace "at the least, membership in a group that is ethnically and physiognomically distinctive." 784 F. 2d 505, 517 (1986). Section 1981, "at a minimum," reaches "discrimination directed against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens.*" *Ibid.* Because respondent had not had full discovery and the record was not sufficient to determine whether he had been subjected to the sort of prejudice § 1981 would redress, respondent was to be given the opportunity to prove his case.[3]

We granted certiorari, 479 U. S. 812 (1986), limited to the statute of limitations issue and the question whether a person of Arabian ancestry was protected from racial discrimination under § 1981, and now affirm the judgment of the Court of Appeals.

---

[2] The Court of Appeals thus rejected petitioners' claim that respondent's complaint alleged only national origin and religious discrimination, assertedly not reached by § 1981.

[3] The Court of Appeals also held that the individual members of the tenure committee were subject to liability under § 1981. The District Court was also to reconsider its dismissal of the pendent state claims.

I

We agree with the Court of Appeals that respondent's claim was not time barred. *Wilson* v. *Garcia*, 471 U. S. 261 (1985), required that in selecting the applicable state statute of limitations in § 1983 cases, the lower federal courts should choose the state statute applicable to other personal injury torts. Thereafter, the Third Circuit in *Goodman* held that *Wilson* applies to § 1981 cases as well and that the Pennsylvania 2-year statute should apply. The Court of Appeals in this case, however, held that when respondent filed his suit, which was prior to *Wilson* v. *Garcia*, it was clearly established in the Third Circuit that a § 1981 plaintiff had six years to bring an action and that *Goodman* should not be applied retroactively to bar respondent's suit.

Insofar as what the prevailing law was in the Third Circuit, we have no reason to disagree with the Court of Appeals. Under controlling precedent in that Circuit, respondent had six years to file his suit, and it was filed well within that time. See 784 F. 2d, at 512–513. We also assume but do not decide that *Wilson* v. *Garcia* controls the selection of the applicable state statute of limitations in § 1981 cases. The Court of Appeals, however, correctly held that its decision in *Goodman* should not be retroactively applied to bar respondent's action in this case. The usual rule is that federal cases should be decided in accordance with the law existing at the time of decision. *Gulf Offshore Co.* v. *Mobil Oil Corp.*, 453 U. S. 473, 486, n. 16 (1981); *Thorpe* v. *Durham Housing Authority*, 393 U. S. 268, 281 (1969); *United States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801). But *Chevron Oil Co.* v. *Huson, supra*, counsels against retroactive application of statute of limitations decisions in certain circumstances. There, the Court held that its decision specifying the applicable state statute of limitations should be applied only prospectively because it overruled clearly established Circuit precedent on which the complaining party was entitled to rely, because retroactive application would be inconsistent with the pur-

pose of the underlying substantive statute, and because such application would be manifestly inequitable. The Court of Appeals found these same factors were present in this case and foreclosed retroactive application of its decision in *Goodman*. We perceive no good reason for not applying *Chevron* where *Wilson* has required a Court of Appeals to overrule its prior cases. Nor has petitioner persuaded us that there was any error in the application of *Chevron* in the circumstances existing in this case.

II

Section 1981 provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Although § 1981 does not itself use the word "race," the Court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts. *Runyon* v. *McCrary*, 427 U. S. 160, 168, 174–175 (1976). Petitioner college, although a private institution, was therefore subject to this statutory command. There is no disagreement among the parties on these propositions. The issue is whether respondent has alleged *racial* discrimination within the meaning of § 1981.

Petitioners contend that respondent is a Caucasian and cannot allege the kind of discrimination § 1981 forbids. Concededly, *McDonald* v. *Santa Fe Trail Transportation Co.*, 427 U. S. 273 (1976), held that white persons could maintain a § 1981 suit; but that suit involved alleged discrimination against a white person in favor of a black, and petitioner submits that the section does not encompass claims of discrimina-

tion by one Caucasian against another. We are quite sure that the Court of Appeals properly rejected this position.

Petitioner's submission rests on the assumption that all those who might be deemed Caucasians today were thought to be of the same race when § 1981 became law in the 19th century; and it may be that a variety of ethnic groups, including Arabs, are now considered to be within the Caucasian race.[4] The understanding of "race" in the 19th century, however, was different. Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law.

In the middle years of the 19th century, dictionaries commonly referred to race as a "continued series of descendants from a parent who is called the *stock*," N. Webster, An American Dictionary of the English Language 666 (New

---

[4] There is a common popular understanding that there are three major human races—Caucasoid, Mongoloid, and Negroid. Many modern biologists and anthropologists, however, criticize racial classifications as arbitrary and of little use in understanding the variability of human beings. It is said that genetically homogeneous populations do not exist and traits are not discontinuous between populations; therefore, a population can only be described in terms of relative frequencies of various traits. Clear-cut categories do not exist. The particular traits which have generally been chosen to characterize races have been criticized as having little biological significance. It has been found that differences between individuals of the same race are often greater than the differences between the "average" individuals of different races. These observations and others have led some, but not all, scientists to conclude that racial classifications are for the most part sociopolitical, rather than biological, in nature. S. Molnar, Human Variation (2d ed. 1983); S. Gould, The Mismeasure of Man (1981); M. Banton & J. Harwood, The Race Concept (1975); A. Montagu, Man's Most Dangerous Myth (1974); A. Montagu, Statement on Race (3d ed. 1972); Science and the Concept of Race (M. Mead, T. Dobzhansky, E. Tobach, & R. Light eds. 1968); A. Montagu, The Concept of Race (1964); R. Benedict, Race and Racism (1942); Littlefield, Lieberman, & Reynolds, Redefining Race: The Potential Demise of a Concept in Physical Anthropology, 23 Current Anthropology 641 (1982); Biological Aspects of Race, 17 Int'l Soc. Sci. J. 71 (1965); Washburn, The Study of Race, 65 American Anthropologist 521 (1963).

York 1830) (emphasis in original), "[t]he lineage of a family," 2 N. Webster, A Dictionary of the English Language 411 (New Haven 1841), or "descendants of a common ancestor," J. Donald, Chambers' Etymological Dictionary of the English Language 415 (London 1871). The 1887 edition of Webster's expanded the definition somewhat: "The descendants of a common ancestor; a family, tribe, people or nation, believed or presumed to belong to the same stock." N. Webster, Dictionary of the English Language 589 (W. Wheeler ed. 1887). It was not until the 20th century that dictionaries began referring to the Caucasian, Mongolian, and Negro races, 8 The Century Dictionary and Cyclopedia 4926 (1911), or to race as involving divisions of mankind based upon different physical characteristics. Webster's Collegiate Dictionary 794 (3d ed. 1916). Even so, modern dictionaries still include among the definitions of race "a family, tribe, people, or nation belonging to the same stock." Webster's Third New International Dictionary 1870 (1971); Webster's Ninth New Collegiate Dictionary 969 (1986).

Encyclopedias of the 19th century also described race in terms of ethnic groups, which is a narrower concept of race than petitioners urge. Encyclopedia Americana in 1858, for example, referred to various races such as Finns, vol. 5, p. 123, gypsies, 6 *id.*, at 123, Basques, 1 *id.*, at 602, and Hebrews, 6 *id.*, at 209. The 1863 version of the New American Cyclopaedia divided the Arabs into a number of subsidiary races, vol. 1, p. 739; represented the Hebrews as of the Semitic race, 9 *id.*, at 27, and identified numerous other groups as constituting races, including Swedes, 15 *id.*, at 216, Norwegians, 12 *id.*, at 410, Germans, 8 *id.*, at 200, Greeks, 8 *id.*, at 438, Finns, 7 *id.*, at 513, Italians, 9 *id.*, at 644–645 (referring to mixture of different races), Spanish, 14 *id.*, at 804, Mongolians, 11 *id.*, at 651, Russians, 14 *id.*, at 226, and the like. The Ninth edition of the Encyclopedia Britannica also referred to Arabs, vol. 2, p. 245 (1878), Jews, 13 *id.*, at 685 (1881), and other ethnic groups such as Germans, 10 *id.*, at

473 (1879), Hungarians, 12 *id.*, at 365 (1880), and Greeks, 11 *id.*, at 83 (1880), as separate races.

These dictionary and encyclopedic sources are somewhat diverse, but it is clear that they do not support the claim that for the purposes of § 1981, Arabs, Englishmen, Germans, and certain other ethnic groups are to be considered a single race. We would expect the legislative history of § 1981, which the Court held in *Runyon* v. *McCrary* had its source in the Civil Rights Act of 1866, 14 Stat. 27, as well as the Voting Rights Act of 1870, 16 Stat. 140, 144, to reflect this common understanding, which it surely does. The debates are replete with references to the Scandinavian races, Cong. Globe, 39th Cong., 1st Sess., 499 (1866) (remarks of Sen. Cowan), as well as the Chinese, *id.*, at 523 (remarks of Sen. Davis), Latin, *id.*, at 238 (remarks of Rep. Kasson during debate of home rule for the District of Columbia), Spanish, *id.*, at 251 (remarks of Sen. Davis during debate of District of Columbia suffrage), and Anglo-Saxon races, *id.*, at 542 (remarks of Rep. Dawson). Jews, *ibid.*, Mexicans, see *ibid.* (remarks of Rep. Dawson), blacks, *passim*, and Mongolians, *id.*, at 498 (remarks of Sen. Cowan), were similarly categorized. Gypsies were referred to as a race. *Ibid.* (remarks of Sen. Cowan). Likewise, the Germans:

> "Who will say that Ohio can pass a law enacting that no man of the German race . . . shall ever own any property in Ohio, or shall ever make a contract in Ohio, or ever inherit property in Ohio, or ever come into Ohio to live, or even to work? If Ohio may pass such a law, and exclude a German citizen . . . because he is of the German nationality or race, then may every other State do so." *Id.*, at 1294 (remarks of Sen. Shellabarger).

There was a reference to the Caucasian race, but it appears to have been referring to people of European ancestry. *Id.*, at 523 (remarks of Sen. Davis).

The history of the 1870 Act reflects similar understanding of what groups Congress intended to protect from intentional

discrimination. It is clear, for example, that the civil rights sections of the 1870 Act provided protection for immigrant groups such as the Chinese. This view was expressed in the Senate. Cong. Globe, 41st Cong., 2d Sess., 1536, 3658, 3808 (1870). In the House, Representative Bingham described § 16 of the Act, part of the authority for § 1981, as declaring "that the States shall not hereafter discriminate against the immigrant from China and in favor of the immigrant from Prussia, nor against the immigrant from France and in favor of the immigrant from Ireland." *Id.*, at 3871.

Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.[5] The Court of Appeals was thus quite right in holding that § 1981, "at a minimum," reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive subgrouping of *homo sapiens.*" It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for § 1981 protection. If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.

The judgment of the Court of Appeals is accordingly affirmed.

*It is so ordered.*

---

[5] We note that under prior cases, discrimination by States on the basis of ancestry violates the Equal Protection Clause of the Fourteenth Amendment. *Hernandez* v. *Texas*, 347 U. S. 475, 479 (1954); *Oyama* v. *California*, 332 U. S. 633, 646 (1948); *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943). See also *Hurd* v. *Hodge*, 334 U. S. 24, 32 (1948).

JUSTICE BRENNAN, concurring.

Pernicious distinctions among individuals based solely on their ancestry are antithetical to the doctrine of equality upon which this Nation is founded. Today the Court upholds Congress' desire to rid the Nation of such arbitrary and invidious discrimination, and I concur in its opinion and judgment. I write separately only to point out that the line between discrimination based on "ancestry or ethnic characteristics," *ante*, at 613, and discrimination based on "place or nation of . . . origin," *ibid.*, is not a bright one. It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country "where a person was *born*, or, more broadly, the country from which his or her ancestors *came.*" *Espinoza* v. *Farah Manufacturing Co.*, 414 U. S. 86, 88 (1973) (emphasis added). Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group. Moreover, national origin claims have been treated as ancestry or ethnicity claims in some circumstances. For example, in the Title VII context, the terms overlap as a legal matter. See 29 CFR § 1606.1 (1986) (emphasis added) (national origin discrimination "includ[es], but [is] not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; *or* because an individual has the physical, cultural, or linguistic characteristics of a national origin group"); *Espinoza, supra,* at 89 (the deletion of the word ancestry from the final version of § 703 of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–2(e), "was not intended as a material change, . . . suggesting that the terms 'national origin' and 'ancestry' were considered synonymous"). I therefore read the Court's opinion to state only that discrimination based on *birthplace alone* is insufficient to state a claim under § 1981.