**Trygve Bredo BAUGE, Plaintiff,**

v.

**Officers Paul JERNIGAN and Hugh Walker, Sergeant Harold Oaks, individually and in their official capacities, John Does, Lance Bell, United Airlines and the City and County of Denver, Defendants.**

Civ. A. No. 87–K–764.

United States District Court, D. Colorado.

Oct. 7, 1987.

Darold W. Killmer, Cohan, Greene & Killmer, Denver, Colo., for plaintiff.

Jonathan A. Cross, Halaby & McCrea, Denver, Colo., for Jernigan, Walker, Oaks and City & County of Denver.

John Grund, Tilly & Graves, Denver, Colo., for Bell & United Airlines.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This is the latest chapter in the continuing saga of Trygve Bredo Bauge, the Norwegian libertarian whose 'calm cultivated wit' (Bauge Affidavit ¶ 30), concept of 'innocent gallows humor' (*id.* ¶ 32) and 'unique sense of humor (Bauge motion for reconsideration p. 5) are not shared or appreciated by the Denver City Police or United Airlines. Avid readers will recall that Mr. Bauge informed an airline clerk at Stapleton International Airport while escorting his mother to her flight to Norway on May 23rd, 1986 that he was 'only here to hijack the plane'. The rest is history[1].

In an opinion and order of September 7, 1987 I dismissed plaintiff's third, fifth, sixth, seventh, and eighth claims for relief as to all defendants. I dismissed plaintiff's ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth claims without prejudice as to all defendants. I struck those portions of plaintiff's first, second, and fourth claims which alleged deprivation of rights created by state law as to all defendants. I modified my earlier order of August 7, 1987 to incorporate dismissal of plaintiff's sixth and seventh claims. I did my utmost to inform Mr. Bauge that he was pursuing this case beneath the looming shadow of Rule 11.

Since then, Mr. Bauge has not been idle. He filed a motion for reconsideration of my order on September 17, 1987. On September 30 he filed a one hundred and fifty two paragraph affidavit. Attached to this were a number of exhibits. These include a 'motion for redress from the frivolous and malicious prosecution and from abuse of process', which appears to be written in iambic pentameter, a copy of a notice of claim addressed to Mayor Pena, a document entitled 'minor remarks' which contains a number of comments about my later opinion in this case, and the plans for a number of what I gather to be Mr. Bauge's work product. These comprise a 'Sunny Earth Biospheric Residence' and a series of other structures which I take to have in common their blast sheltered and resistent quality. These buildings are all designed to withstand and survive nuclear war and other disasters.

I can only compliment Mr. Bauge on the symmetry and coherence which characterizes the relationship between his indispensable profession and his political ideology. The affidavit of September 30 sets forth the details of both at some length. For example, Mr. Bauge asserts that the well-known (or 'infamous' as he terms it) decision of the Supreme Court in 1918 in which Mr. Justice Holmes delineated the operation of the First Amendment by positing the permissible prohibition on shouting fire in a crowded theater, *Schneck v. United*

---

1. And well documented in my two previous opinions on this case of August 7 and September 3, 1987.

*States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919) is actually unconstitutional. The novel solution he suggests is that 'if we built fire proof theaters and let people know about this then the shouting of fire would not cause panic' (Bauge affidavit, ¶ 16). He further makes the point that as long as 'the president can joke about starting a nuclear war, the rest of us should at least be permitted to shout fire' (*id.* ¶ 17).

Mr. Bauge continues by supplementing the details of his arrest with a series of arguments as to why his conduct in making this 'light remark' (Bauge affidavit ¶ 31) should not have attracted the attention it subsequently did.

> Most of us know someone named Jack, sooner or later you might run into him at the airport. If you were to greet him with "Hi Jack" would they call out the SWAT team?
>
> Bauge affidavit ¶ 43.

Apparently, a number of Mr. Bauge's associates have had such experiences. One, for example, responded to an air stewardess who requested that he put his bag on a shelf above the seats, saying, 'Do you think I have a bomb or something' (Bauge affidavit ¶ 45). Another experienced some difficulty when on a domestic flight he asserted he was going to take the plane out of the country. It seems he was referring to the fact he was going to Mexico (*id.* ¶ 46).

Mr. Bauge supplements allegations already made by informing us a little more about the circumstances of his detention. Allegedly one particular officer, G. Spurio,

> stated that I had no rights, that he would like to have me run so he could shoot me in the back.
>
> Bauge affidavit ¶ 75.

In fact Mr. Spurio, not a defendant in this case, appears to have been less than affectionate towards Mr. Bauge,

> I am placed in a lift, and iron bars are closed in front of me, the kind of open old fashioned bars that offer no protection against bullets. G. Spurio, still outside the lift, turns to me, puts his hands on his guns, and says "lets shoot him right away and he will cause less trouble".

> Bauge affidavit ¶ 86.

Perhaps Officer Spurio and defendant have more in common than the latter suspects.

Mr. Bauge continues to describe the circumstances surrounding his detention ('Halloween suddenly became tame by comparison' Bauge affidavit ¶ 110), the effect this has had on his personal and professional life, and indeed further details of his ideals and aspirations, ranging from his membership in the Polar Bear Club (*Id.* ¶ 134) to the fact his detention set back his work by at least two years,

> which means that whenever we get the next large scale military conflict there will have been two years less constructed of my shelters, which translates into lives, let us just hope it is (sic) not yours and mine.
>
> *id.* ¶ 141

Mr. Bauge has certainly impressed me as a gentleman with strong and committed political views who makes a most valuable contribution to our society and who has suffered, to say the least, a traumatic experience. I am not so sure, however as he suggests that I want to survive a large-scale military conflict. I don't know; I'm just not sure. His affidavit relates a regrettable and sorry tale. I am afraid, however, Mr. Bauge has misconceived the nature of the strictures within which I operate in discharging my judicial functions.

In his motion for reconsideration of my memorandum opinion and order of September 3, he seeks to have vacated that portion of my order which dismissed his claims for relief based upon title 42 U.S.C. §§ 1985(3) and 1986.

This motion for reconsideration is denied for three reasons.

In my opinion of September 3, I pointed out I could not entertain plaintiff's § 1986 claim if his § 1985 claim fell (*id.* at p. 6). I dismissed the § 1985 claim, stating,

> In *Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1176 (10th Cir.1983), *cert. denied,* 465 U.S. 1103 [104 S.Ct. 1601, 80 L.Ed.2d 131] (1984), the Tenth Circuit

construed *United Brotherhood of Carpenters v. Scott,* 463 U.S. 825 [103 S.Ct. 3352, 77 L.Ed.2d 1049] (1983) to "signal that the classes covered by § 1985 should not be extended beyond those already expressly provided by the Court." The *Wilhelm* court therefore concluded "that a class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now § 1985(3)." Following *Wilhelm,* as I must, I cannot and will not extend the number of groups protected by § 1985(3) to include Norwegians.

*id.* at p. 6. Footnote omitted.

I included a footnote, however, indicating my awareness of the recent decisions of the Supreme Court in *Saint Francis College v. Al-Khazraji,* —— U.S. ——, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) and *Shaare Tefila Congregation v. Cobb,* —— U.S. ——, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987). Plaintiff's counsel had not cited either of these authorities in initial briefing on defendant's motion to dismiss. He has now decided they are of assistance and has brought this motion for reconsideration on the strength of them.

I begin by making a commonsense observation. I have never encountered, I know of no-one who has ever encountered, I have never heard of, and—aside from a modest aversion to Greig or a bad experience in the Winter Olympics—can conceive no basis for, racially based antipathy towards Norwegians. Certainly Henrich Ibsen never generated such feelings and Trygve Lie produces gusts of admiration by all. I find the idea that the Denver City Police Department is seething with officers bearing a grudge against Norway, fanciful in the extreme. Nonetheless, I should not hesitate to consider plaintiff's claims were he to adduce some evidence of this alleged *animus.* In my opinion of September 3, I expressed in passing the view that 'plaintiff alleged the requisite discriminatory *animus* in averring that he is a Norwegian alien and a libertarian' (*id.* at p. 6). On further consideration, I deem this to have been mistaken. The only allegation I can find is that defendants called the Immigration and Naturalization Service 'only because they thought Bauge was from Norway'. I do not aspire to Mr. Bauge's high standard of 'cultivated wit', but given the not entirely ubiquitous nature of the functions exercised by the latter body, I doubt defendants would have prevailed upon the services of the Immigration and Naturalization Service if they thought he was from Nebraska.

Secondly, plaintiff relies upon the fact that in *Saint Francis College* the court asserted the Scandinavian races fall within the purview of the Civil Rights Act. Plaintiff misses the fact, however, that the Court went to great pains to distinguish between the assertion an individual was the subject of discrimination on the basis of his race, and the claim such discrimination was based on national origin, —— U.S. ——, ——, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582, 592. In fact the entire point of *Saint Francis College* was that the district court had determined the pleadings asserted only claims based upon national origin, but it also found that if a racially based claim had been made, Arabs were not a protected race. The Court remanded the case to the district court with the direction that if a claim had been stated for racial *animus,* it was sustainable. But the point remained that a claim could not be based on place or nation of origin alone.

Thus, while a claim couched in terms of plaintiff being born Iranian could not sustain scrutiny under *Saint Francis College,* a claim based upon plaintiff being an Arab could. Plaintiff's complaint in the instant case is based solely upon his being a Norwegian citizen. The complaint makes no effort to clothe this claim in terms of a racial *animus* as opposed to a national *animus*[2]. This is not surprising considering plaintiff's counsel was clearly not aware of the cases upon which he now so heavily relies until I mentioned them.

---

**2.** I quite agree with anyone who wants to suggest that these sorts of distinctions make no sense either, but they are made by the Supreme Court of the United States. In this context Mr. Justice Brennan's separate opinion in *Saint Francis College* should be noted.

Third, the remarks in *St. Francis College* regarding Scandinavians were *obiter.* When faced with a clear choice between diving into the morass of conjectured Supreme Court comments, and wallowing in the clear and ice-cold logic of the Tenth Circuit, I have no doubt as to where my polarity lies.

It is therefore ORDERED Plaintiff's motion for reconsideration is DENIED.