**Emmanuel K. OHEMENG, Plaintiff,**

v.

**DELAWARE STATE COLLEGE, et al., Defendants.**

**Civ. A. No. 85–748–JRR.**

United States District Court,
D. Delaware.

Jan. 5, 1988.

Emmanuel K. Ohemeng, pro se.

Nicholas H. Rodriguez, of Schmittinger & Rodriguez Dover, Del., for defendants.

## OPINION

ROTH, District Judge.

In the wake of his discharge as an assistant professor at Delaware State College (the "College"), plaintiff, Emmanuel K. Ohemeng, brings a discrimination action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, ("Title VII") and to 42 U.S.C. § 1981 ("§ 1981") against the College, several individual members of its Board of Trustees, and present or former deans and presidents of the College. In a previous opinion, this Court denied defendants' motion for summary judgment premised on the grounds, *inter alia,* that plaintiff had failed to state a claim under § 1981. *Ohemeng v. Delaware State College,* 643 F.Supp. 1575 (D.Del.1986). The Court permitted plaintiff to conduct discovery regarding his § 1981 claim. *Id.* at 1583. The time for discovery having expired, defendants have moved again for summary judgment, arguing that plaintiff has not met his burden of proof with respect to his Title VII action and arguing once more that plaintiff has failed to state a claim with respect to his § 1981 action. The Court will deny summary judgment as to the Title VII action and will grant partial summary judgment as to the § 1981 action.

## I. FACTS.

The plaintiff's biography can be drawn in a few broad strokes. He is a black naturalized American citizen who immigrated from Ghana to the United States in 1959. His *curriculum vitae* includes several degrees: a Bachelor of Arts, a Masters in Business Administration, and a Juris Doctor. In the decade preceding his employment by Delaware State College, he had worked at four other post-secondary institutions.

Ohemeng taught economics, law, and accounting at the College for three years before the instant controversy arose. On August 28, 1980, the College hired him to instruct business courses for the 1980–81 school year. The College later renewed Ohemeng's contract for the two subsequent school years. During this time, Dr. Charles Price, Chairman of the Department of Economics and Business Administration, twice favorably evaluated his job performance.

The 1983–84 school term proved to be plaintiff's last at the College. On April 28, 1983, Ohemeng countersigned a one page letter from the College appointing him an assistant professor of economics and business administration for the next term. An asterisked provision of the letter stipulated the contract was "terminal," *i.e.,* it was to be the last one tendered to Ohemeng. Ohemeng claims he did not read that provision at the time he countersigned the letter. He avers that, when he became aware of the provision in September, 1983, he questioned Chairman Price and Price assured him his employment would continue. In contrast, after Price's death in October, his replacement, Raymond J. Grandfield, considered the "terminal contract" dispositive as to Ohemeng's future at the College. However, several events might have led Ohemeng to believe that the College was reconsidering its decision. Grandfield favorably evaluated his performance. Ohemeng participated in faculty discussions concerning the 1984–85 term. He was slated to teach four undergraduate courses for each of the term's semesters. Despite these equivocations, on March 8, 1984, the College's Board of Trustees conclusively determined Ohemeng would not be reappointed and on March 16, 1984, Ohemeng was notified of that determination.

According to College administrators, Ohemeng was dismissed as part of an effort both to improve the quality of the business faculty and to inaugurate a M.B.A. program. In turn, this effort was prompted by the recommendation of the Delaware Desegregation Task Force that the College start a M.B.A. program (as part of a plan to desegregate public higher education) and by the concerns of the College itself and of Middle States, its academic accreditor, that the current business faculty could not adequately support a M.B.A. program. The plaintiff was singled

out for dismissal because he did not have a doctorate, he was not tenured, and certain College administrators had received unspecified student complaints concerning plaintiff.

After Ohemeng's dismissal, the College sought new business personnel and eventually hired two applicants. As part of its search, the College placed the following advertisements in the "positions available" section of *The Chronicle of Higher Education:*

(1) Assistant Professor: To teach business law, taxation, and real estate. J.D. and MBA or LLM degrees required. Teaching experience desirable.

(2) Assistant Professor: To teach courses in the area of accounting. MBA and CPA required. Doctorate degree preferred.

To fill the first position, the College hired Mr. Jamison, a black native American who had J.D. and LL.M. degrees. To fill the second position, the College hired Mr. Peppard, a white native American who had a B.S. in accounting and a C.P.A.

## II. STANDARD OF REVIEW.

Rule 56(c) of the Federal Rules of Civil Procedure provides that "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law," then the court may render summary judgment. As the Supreme Court has recently ruled, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2252–53, 91 L.Ed.2d 265 (1986). "[T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict, if under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## III. LEGAL ANALYSIS.

### A. *Title VII.*

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Here, Ohemeng asserts he was discriminated against on the bases of his race and of his national origin.

A plaintiff in a Title VII case bears the burden of persuasion. To satisfy this burden, the plaintiff can choose one of two litigational paths. The plaintiff can establish liability by direct evidence. *Dillon v. Coles,* 746 F.2d 998, 1002–3 (3d Cir.1984). Alternatively, because discrimination is often subtly practiced, the plaintiff can establish liability by indirect evidence, facilitated by shifting burdens of production. Ohemeng has introduced no direct evidence that his discharge was discriminatorily motivated; his suit proceeds down the second path.

In *Texas Dept. of Community Affairs v. Burdine,* the Supreme Court allocated the shifting burdens of persuasion in Title VII litigation:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). This scheme can be straightforwardly applied to the instant litigation. First, for purposes of this motion, the College has

conceded that Ohemeng has established a prima facie case both as to national origin and racial discrimination.[1] Second, the College has articulated a legitimate reason for its action: it wished to improve the quality of its business faculty. Third, viewing the record in the light most favorable to plaintiff, plaintiff may be able to show the College's articulation is mere pretext. To put it starkly, the College maintains it dismissed plaintiff in order to upgrade the credentials of its business faculty but, when it advertised for Ohemeng's replacement, it sought candidates having the same degrees Ohemeng possessed. In addition, the College hired an applicant with credentials comparable to Ohemeng's. As for the statements by school administrators that they had received student complaints concerning Ohemeng, those complaints are contradicted by the College's three favorable reviews of Ohemeng's performance. Given that material issues of fact persist as to whether the "legitimate, nondiscriminatory reasons" for Ohemeng's discharge, offered by the College, are "pretext for discrimination," summary judgment is inappropriate, and defendants' motion to dismiss the Title VII claim must be denied.

B. *Section 1981.*

Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In the words of the Supreme Court: "Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis College v. Al-Khazraji,* — U.S. —, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 *reh'g denied,* — U.S. —, 107 S.Ct. 3244, 97 L.Ed.2d 749 (1987), *citing Runyon v. McCrary,* 427 U.S. 160, 168, 174–75, 96 S.Ct. 2586, 2593, 2596, 49 L.Ed.2d 415 (1976). In contrast, § 1981 has not been construed to forbid discrimination based solely upon an individual's place or nation of origin. *Saint Francis, supra,* 107 S.Ct. at 2028.

In his amended complaint, plaintiff claims he was dismissed due to his "national origin and/or race."[2] To the ex-

---

**1.** The Court questions whether plaintiff has actually established a *prima facie* case with respect to racial discrimination. To establish a *prima facie* case of discriminatory discharge, a plaintiff must prove: (1) that he belongs to a racial minority; (2) that he was qualified for the job he was performing; (3) that he was satisfying the normal requirements in his work; (4) that he was discharged; and (5) that after discharge the employer assigned those who were not members of plaintiff's racial minority to perform the same work. *Flowers v. Crouch Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir. 1977); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 117–18 (3rd Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *see also Ferguson v. E.I. DuPont de Nemours and Co., Inc.,* 560 F.Supp. 1172, 1192 (E.D. 1983) (similar criteria in context of employment promotions). Applying the last factor to the instant litigation, plaintiff, a black, was apparently replaced by Mr. Jamison, a black. While the five-factor standard listed above should not be mechanically applied, in the instant factual situation the plaintiff's failure to meet that stan-

dard seems fatal to his racial discrimination cause of action. By contrast, plaintiff's Title VII national origin cause of action survives the analogous *prima facie* test used in national origin litigation since plaintiff, a native Ghanian, was apparently replaced by Mr. Jamison, a native American.

If the plaintiff proceeded only on the basis of racial discrimination, the Court would ask that this issue be independently briefed. However, given our ruling that plaintiff may proceed to trial with respect to his Title VII national origin claim, we will allow plaintiff to proceed with his racial claim under Title VII. This discussion equally pertains to plaintiff's claims of racial discrimination under § 1981, discussed below, assuming that a *prima facie* case under § 1981 requires no additional elements than the criteria needed to make a Title VII *prima facie* case enumerated above. *See discussion, Ziering v. New York City Dept. of Health,* 621 F.Supp. 679, 680–81 (S.D.N.Y.1983).

**2.** While plaintiff once argued he was discriminated against because he belonged to a subset of the Negroid race having a distinct ancestry or distinct ethnic characteristics, *Saint Francis, su-*

tent plaintiff premises his § 1981 claim on national origin *per se*, he has failed to state a claim and summary judgment will be awarded defendants. *Id.* To the extent plaintiff premises his § 1981 claim on racial discrimination, his complaint does state a claim. Furthermore, because § 1981 litigation tracks Title VII litigation and its *Burdine* scheme of shifting burdens of proof, *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir.1983), the Court will deny defendant's motion for summary judgment on the § 1981 claim, to the extent that it is premised on racial discrimination, for the same reason that we have denied defendant's motion for summary judgment on the Title VII racial discrimination action.[3] We will grant summary judgment in favor of defendants on the § 1981 claim insofar as plaintiff alleges discrimination due to national origin.

An appropriate order will follow.

*pra*, 107 S.Ct. at 2026, n. 4, 2028, plaintiff has not factually developed that claim.

**3.** See n. 1, *supra*.