Angelo GRILLO, Plaintiff,

v.

The NEW YORK CITY TRANSIT AUTHORITY, The City of New York, The New York City Department of Citywide Administrative Services, Nora Bassett, individually and in her Official Capacity, Elizabeth Soto, individually and in her Official Capacity, Bonnie Lee, individually and in her Official Capacity, Karl Miller, individually and in his Official Capacity, Peter Ingoglia, individually and in his Official Capacity, Richard Wachenheim, individually and in his Official Capacity, Defendant.

No. CV 97–7280.

United States District Court, E.D. New York.

Nov. 21, 2000.

Raymer Moghadassi, New York City, for plaintiff.

Paulette Thompson, Richard Schoolman, Office of the General Counsel, New York City Transit Authority, Brooklyn, NY, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Angelo Grillo a white male of Italian origin brought this action against the City of New York, The New York City Transit Authority (the Transit Authority) and various officers and employees of the Transit Authority, alleging, among other things, that they improperly demoted him from his probationary job due to racial, ethnic, and gender discrimination, in violation of 42 U.S.C. §§ 2000e, 1981, 1983, 1985, and New York State and New York City legislation and law.

Plaintiff Grillo served three complaints. The first made eleven claims. The next, styled "First Amended Complaint," made twelve claims. The third, styled "Second Amended Complaint," made fifteen claims. The Second Amended Complaint realleges all of the allegations previously made, and each of the fifteen claims purports to reallege all the statements in all the previously alleged claims. The addendum clause asks for five million dollars in damages, plus full back pay, front pay, and reimbursement for various allegedly lost benefits.

The defendants have moved for summary judgement dismissing the Second Amended Complaint. The papers submitted for and against the motion show, in substance, the following.

I

In 1996, Grillo, who had been employed for some years by the Transit Authority, held a Civil Service permanent job of light maintainer, a position involving the rehabilitation of lighting fixtures and wiring in stations and tunnels. In December of that year the Transit Authority promoted him on a one-year probationary basis to the position of a Supervisor of Lighting Maintenance. Grillo's successful completion of the one year probationary period would

have enabled him to hold the permanent title as a supervisor.

On June 30, 1997, Peter Ingoglia, the Manager of the office of Labor Relations of the Transit Authority, after an investigation, demoted Grillo back to his former civil service title, light maintainer.

Ingoglia said he made the decision to demote for several reasons. Grillo had engaged in what Ingolia found to be improper conduct in a training course. In addition, Ingoglia had received from Grillo's supervisors a poor performance evaluation because of Grillo's repeated failure to perform his job adequately.

The training course was called the Supervisory Training Core Curriculum, a course for new supervisors. The course began June 16, 1997 and was scheduled to run for two weeks for about seven hours a day. The instructors were defendants Nora Bassett (a Black), Bonnie Lee (a Black), and Elizabeth Soto (an Hispanic). According to the course design, the three instructors were to present the material on an alternating basis, either individually or in a team.

About twenty-seven supervisors from various operating divisions of the Transit Authority attended the program. Of the twenty-seven, eleven, were white males and some of those eleven were apparently of Italian heritage. One of the eleven was Grillo.

During the first week of the class the instructors observed Grillo to be disruptive and disrespectful towards the class, the other participants, and the material. According to the instructors, Grillo refused to comply with directions during class such as periodically moving to an assigned seat during group exercises. He continuously made jokes during the discussion by the instructors, and constantly asked to go on breaks and to go home at inappropriate times. He also made sexist remarks, referring to the material as "woman's stuff," and stating "women should expect to be grabbed and pulled on, walking around dressed like these women, in this building." He frequently interrupted other participants when they spoke without allowing them to complete their thoughts.

On June 20, 1994, three visitors were asked to attend the class. They were Lawrence Miller, the Director of the Transit Authority's Equal Employment Opportunity Office, Jimmy Wilson, the Assistant General Manager of Operations Support for the Department of Buses, and Jack Dempsey, the Transit Authority's Assistant Vice President of Training.

While Miller was speaking, Grillo made remarks and broke into loud laughter. After Miller and Dempsey had spoken and were leaving, Grillo bolted from his seat, brushed by Instructor Lee, disrupting her presentation, and yelled to Miller, "Hey you, I want to ask you something," and followed Miller and Dempsey out into the hallway.

Instructors Bassett and Lee then talked to the class about the lack of respect and attention given to visitors during their remarks to the class and the level of behavior expected of a supervisor. The instructors then dismissed the class for the lunch break.

During the break Wilson approached Bassett and Lee with his supervisor Patricia O'Brien, Vice President of the Department of Buses, whom he had informed as to Grillo's behavior. O'Brien told Bassett to call Gene Cooper, the Assistant Chief Officer of the Department of Infrastructure, and inform him of what had happened. Cooper then told Grillo and the instructors that Grillo was being removed from the class.

Grillo, Cooper and Miller then met. Miller told Grillo to prepare and submit a written statement explaining what had happened in the class. Grillo did so. The statement, dated June 20, 1997, in substance stated that Grillo was "unaware of any behavior pattern" he might have exhibited that would have been considered offensive, since the atmosphere in the

classroom encouraged participation. He added that he became embarrassed when "Nora Basset" (sic) joked as to another student, who habitually came to class a minute before it started, being a "minute man" "as it related to his sexual performance."

Grillo's statement contained no mention that he regarded himself as having been discriminated against in any way, let alone on the grounds of "race" or "gender," or "national origin."

On June 23, 1997 Ingoglia, having received Grillo's statement and a statement from the three instructors, spoke with defendant Richard Wachenheim, the Transit Authority's Chief of Infrastructure Office. Ingoglia told Wachenheim, that, while he believed Grillo's behavior warranted demotion, he had decided to request a work performance evaluation from Karl Miller, who was Grillo's supervisor and in December 1996 had approved Grillo's promotion to the probationary position of a supervisor.

Ingoglia made the request of Karl Miller, who was the Project Superintendent in Station Rehabilitation when Grillo was appointed in December 1996 and assigned to the Church Avenue Station Rehabilitation project. Karl Miller's evaluation included the following. In January 1997 Miller sent to Grillo written instructions to provide a list of the existing circuit breakers contained in the electrical panels at Church Avenue. During a subsequent field visit to Grillo's station Miller found Grillo's information incorrect, although it was a very basic electrical identification task. Grillo said he would be more attentive in the future.

Karl Miller personally assisted Grillo with the first lighting fixture, trough, and hardware delivery at Church Avenue, explaining the various types of hardware and brackets for installation. Grillo then volunteered to make the installations during a weekend general order. After eight hours into a twelve-hour tour, he called Miller at home and said he had trouble installing the fixtures according to the prints, and so he had redeployed the men on other tasks. Miller, on his arrival for the second tour, found four employees hand carrying a fixture through the street from the connect box, contrary to what Miller had previously discussed with Grillo.

When Karl Miller inspected the partial platform installation he found a manufacturer's defect with the seams when the fixtures were assembled together. Several key fixtures were missing, and one was not installed in accordance with the layout drawings with which Grillo was working. In addition, a two compartment trough was improperly mounted to its support bracket.

On another occasion Grillo called Karl Miller with a problem regarding signal feeds where Grillo was unable to comprehend the information shown on the drawings. Later Miller revised Grillo's planned conduit layout for a mezzanine to make it more practical, inconspicuous and easier. Miller reminded Grillo that he had acquired a bad habit of talking when he should be listening.

Karl Miller concluded that based on the instances he personally had with Grillo he did not find that Grillo had the skills, knowledge, or leadership required to be a maintenance supervisor.

On June 30, 1997, Ingoglia, having compiled all the information received from Grillo, Karl Miller, and the instructors, informed Wachenheim that Grillo would be returned to his former civil service title. On the same day Ingoglia met with Grillo and told him of the decision to terminate his probationary period due to his unsatisfactory performance.

After being advised of his return to the position of light maintainer Grillo wrote out a seven page statement full of invective directed at the three instructors, accusing them of using "unbecoming language" that amazed, shocked, offended, and appalled him. He accused Bassett of threatening

him physically when she had become angry with his behavior on June 20, 1997 and said she felt like hitting him with a two by four and throwing hot coffee on him. He claimed, without detailing any evidence, that "the only reason I was singled out is due to my race." His final sentence was: "I will be following this matter through."

On August 8, 1997, Grillo filed with the New York City Commission on Human Rights a charge against the Transit Authority and the three female instructors asserting that the instructors targeted Grillo because of his white "race," discriminated against him, and thereby denied him "equal terms and conditions of employment because of his race," in violation of the New York City Administrative Code and Title VII of the Civil Rights Act of 1964. Grillo authorized the City Commissioner to accept the complaint on behalf of the United States EEOC, and it was so accepted.

On August 12, 1997, Grillo filed a claim with the Transit Authority claiming he had been damaged because he had been demoted and had suffered emotional distress and monetary damages. The claim alleged he had been subjected to "abusive, harassing, slanderous, libelous and defamatory statements and actions by employees" of the Transit Authority. The slanderous libelous, and defamatory statements were allegedly made by Soto, Lee and Karl Miller. The threatening abusive and harassing statements were allegedly made by Bassett.

On January 23, 1998 the EEOC issued to Grillo a right to sue letter as to the matters alleged in the August 8, 1997 charge of "race" discrimination.

## II

Defendants urge that the court should dismiss Grillo's Title VII claims for ethnic and national origin discrimination on the ground that the court has no jurisdiction over claims not based on the sole charge of "race." *See Butts v. City of New York Department of Housing,* 990 F.2d 1397 (2d Cir.1993).

Grillo's Title VII court claim asserts that his "employer" discriminate[d] against him with respect to "the terms, conditions or privileges" of his employment because of his "race,—sex, or national origin."

Since the charge filed by Grillo with the EEOC was solely "race" discrimination, defendants contend that this court has no jurisdiction over Grillo's Title VII claim. A District Court has jurisdiction to hear Title VII claims only if they are "included" in an EEOC charge or are "based on conduct subsequent to the EEOC charge which (sic) is reasonably related to that alleged in the EEOC. charge." *Butts,* at page 1401. The purpose of this notice provision is to encourage settlement of disputes, a purpose that "would be defeated" if a complainant could litigate a "claim" not previously presented to and investigated by the EEOC. *Id.*

There are two elements to a "claim." One is the legal ground for the claim, for example, "race," or "gender," or "national origin." The other element consists of the facts that allegedly bring the case within the scope of the legal ground for the claim, for example, the acts committed by the defendant giving rise to the injury to the plaintiff.

In *Butts* the court had before it a case where the plaintiff, Geneva Butts, an African American, alleged that the defendants had denied her promotions and had otherwise discriminated against her in the terms and conditions of her employment, all based on her race (Black) and sex (female). In her charge filed with the EEOC she stated that her supervisor "held department reorganization meetings without informing me of the meetings or results." In her complaint in the District

Court, Butts alleged that she had been excluded from discussions relating to her department's participation in a study of ways to improve efficiency and relating to a proposed move of the department.

The Circuit Court held that the EEOC investigation into the charge of exclusion from department meetings likely would have included an inquiry into the matters complained of in her court complaints. According to the court, these matters were "reasonably related" to exclusion from "department reorganization meetings."

In short, the Circuit Court, in interpreting what it meant by a court claim "reasonably related" to the "charge" before the EEOC, was prepared to condone a certain amount of "loose pleading" where the "conduct" complained of in court would fall within the scope of the agency investigation that could reasonably be expected to grow out of the charge filed with EEOC. *Butts*, at 990 F.2d 1402, citing *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 107 (2d Cir.1978).

In *Mathura v. Council for Human Services*, 1996 WL 157496 (S.D.N.Y.1996), affirmed 107 F.3d 3 (2d Cir.1997) (unpublished order), the District Court held that in a Title VII case claims in court of national origin, gender, and disability discrimination were not "reasonably related" to the "race/color" discrimination charge asserted before the EEOC. This holding was affirmed by the Court of Appeals in an unpublished opinion, 107 F.3d 3 (2d Cir. 1997). *See also Peterson v. Insurance Co. of N.A*, 884 F.Supp. 107, 109–110 (S.D.N.Y. 1995); *Narvarte v. Chase Manhattan Bank N.A.*, 969 F.Supp. 10 (S.D.N.Y.1997); *Dixit v. City of New York Dep't. of General Services*, 972 F.Supp. 730, 734 (S.D.N.Y. 1997).

It seems unlikely that *Mathura* would be considered good law today in the light of the Supreme Court's opinion in *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), and the Second Circuit opinion in *Lopez v. S.B. Thomas*, 831 F.2d 1184 (2d Cir.1987), which followed. Both cases involved the question of whether a plaintiff claiming employment discrimination could obtain relief under 42 U.S.C. § 1981. That section accords to all persons within the jurisdiction of the United States the "same right" to make and enforce contracts and to the full and equal benefit of all laws for the security of persons "as is enjoyed by white persons."

In *Saint Francis College* the Supreme Court held that, while § 1981 does not use the word "race", the legislative history of the section was persuasive that it should be construed to forbid all "racial" discrimination in the making of contracts, at least where the intentional "racial" discrimination against the plaintiffs was "because of their ancestry or ethnic characteristics" irrespective of the color of their skins. 481 U.S. at 613, 107 S.Ct. at 2028.

The court thus in effect distinguished from "white" persons those who are the subject of discrimination, including persons such as Finns, Gypsies, Basques, Hebrews, Swedes, Norwegians, Germans, Greeks, Italians, Spaniards, Russians, Arabs, and Mexicans, as well as, presumably, even Americans of Anglo Saxon heritage. So much for the literal reading of statutes! (Justice Scalia, who had taken office on September 26, 1986 and joined the opinion, did not write.)

In the light of the Supreme Court's opinion interpreting the words "white persons" to mean no more in § 1981 than persons with any place of birth or "national origin" it would be a bold District Judge who would say that "race" had a more restricted meaning in Title VII.

The court thus rejects the defendant's argument that it has no jurisdiction over Grillo's Title VII claim that he was discriminated on the ground of "national ori-

gin," namely, as a person of Italian ancestry.

■ Though the defendants did not argue the court's lack of jurisdiction over Grillo's gender discrimination claims under Title VII, the court will address the issue. Grillo did not include a gender discrimination claim in his EEOC charge. In fact, he did not allege gender discrimination in the complaint or the First Amended Complaint. Grillo's gender claim appeared for the first time in his Second Amended Complaint.

Because the gender discrimination claim was not included in Grillo's EEOC charge and gender discrimination claims are not "reasonably related" to discrimination claims based on race or national origin, the court will dismiss Grillo's claim of gender discrimination under Title VII. *See Dennis v. Pan American World Airways,* 746 F.Supp. 288, 291 (E.D.N.Y.1990).

### III

■ Grillo's claim of racial discrimination charged before the EEOC is properly before the court under both Title VII and 42 U.S.C. § 1981. Grillo is a white male of Italian heritage. He claims that he had performed his duties satisfactorily, that an adverse employment action was taken against him, and that the action occurred under circumstances giving rise to an inference of discrimination because of his "race." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To make out a prima facie case Grillo was required to present evidence showing he had met all of the elements set forth in *McDonnell Douglas.* His demotion from supervisor of light maintenance to light maintainer was an adverse employment action.

But Grillo has presented no substantial evidence other than his own say so that he had been performing his job duties satisfactorily. "The ultimate inquiry is whether an employee's performance meets [his] employer's legitimate expectations." *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985), quoting *Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir.1983), see also *Viola v. Philips Medical Systems of North America,* 42 F.3d 712, 718 (2d Cir.1994).

Karl Miller's detailed evaluation of plaintiff's performance has a ring of legitimacy. He had approved Grillo's promotion to the probationary position of supervisor, and Grillo has pointed to no evidence that Karl Miller bore any malice toward him or had any interest other than that of the Transit Authority.

Plaintiff's brief misquotes the deposition of Anthony Aceto, a deputy to Karl Miller and the immediate supervisor of Grillo, to read that Grillo's "performance" was "satisfactory." In fact Aceto testified that Grillo did not have the "supervisory skills" to be a supervisor. Grillo was, after all, on probation, and Karl Miller was not obligated to retain a supervisor whose work he found unsatisfactory.

Moreover, Grillo's behavior before the class was, to say the least, inappropriate, or could reasonably be perceived as such by his supervisors and superiors. Finally, Peter Ingoglia, like Grillo a white male of Italian ancestry, was the male labor relations official who in fact demoted Grillo to his previous position. The instructors did not demote him or suggest that he be demoted. They simply prepared their statement at the request of their supervisors.

Grillo suggests that the three instructors of the class were prejudiced against him because all three were female, two Black and one Hispanic. No doubt those who saw Grillo in class were not pleased with his behavior, but that did not mean that they were "prejudiced against" him. His own self serving statement is not ade-

quate to permit an inference of prejudice on the part of the instructors, and Grillo has submitted no other testimony to support such an inference.

### IV

 Grillo makes three other Federal Claims. He says some of the defendants, including Karl Miller, Ingoglia and the instructors, each with an evil motive, conspired to deprive him of his "property" right to remain in his job as a supervisor in violation of the Due Process clause and 42 U.S.C. § 1985.

The premise for this claim is false. As a probationary employee Grillo had under New York law no entitlement to his job. He could be returned to his former job without a hearing. The claim does not have faintest merit. In addition, there is no substantial basis to infer that any of the defendants acted for personal reasons outside their roles as employees of the Transit Authority.

Grillo also says his First Amendment right was violated because his removal from the training class was occasioned by what he said in the class, including his interruptions and his "hey you" comment. His remarks were not of public concern involving weighty or civic matters. The claim is meritless.

Both the Due Process claim and the First Amendment claim will be dismissed.

### V

Plaintiff agrees that the balance of his claims are pendent and based on New York law. The court's jurisdiction is based on the Federal claims.

The court declines to consider the state law claims. They will be dismissed.

### VI

The defendants' motion for summary judgment on all of plaintiff's claims is granted.

So ordered.