**P.S. MOHANKUMAR, Plaintiff,**

v.

**Jon D. DUNN, individually and in his official capacity; and Kansas State University, Defendants.**

**No. 97–1555–WEB.**

United States District Court, D. Kansas.

May 13, 1999.

Pantaleon Florez, Jr., Florez & Frost, P.A., Topeka, KS, for plaintiff.

Eliehue Brunson, Office of Atty. Gen., Kansas Judicial Center, Topeka, KS, Jennifer Kassebaum, Kansas State University, Legal Dept., Manhattan, KS, for defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff alleges in this action that the defendants engaged in unlawful discrimination when they failed to hire him for an assistant professor position at Kansas State. The matter is now before the court on the defendants' motion for summary judgment.

In keeping with the standards governing summary judgment, any facts in the parties' briefs not properly supported by the record have been deleted from the following statement of facts. Any matters on which the record discloses a genuine dispute of fact have been construed in plaintiff's favor for purposes of determining whether the defendants are entitled to judgment as a matter of law.

### I. Facts.

Plaintiff is a 34–year old male whose nation of origin is India. In 1988, plaintiff graduated from Madras Veterinary College in India with a bachelor of veterinary science degree, which is considered the equivalent of a doctorate in veterinary medicine in the United States. After obtaining this degree, plaintiff came to Kansas State University in August of 1988 as a Ph.D. candidate in the Department of Anatomy and Physiology in the College of Veterinary Medicine. He obtained his Ph.D. in May 1993.

Dr. Kaleem Quadri was plaintiff's major professor when plaintiff was a graduate student at Kansas State University. All of plaintiff's research publications were co-authored by Dr. Quadri.

Since 1990, defendant Dr. Jon Dunn has been the head of the Department of Anatomy and Physiology in the College of Veterinary Medicine at KSU. The department head is responsible for the administration of the department, including hiring decisions within the department.

After plaintiff's graduation in 1993 to 1995, plaintiff made two or three unsuccessful requests of Dr. Dunn for faculty status in the form of "courtesy appointments." These faculty appointments would have allowed plaintiff to apply for grants for research that he intended to conduct with Dr. Quadri. The University was not seeking, and does not seek, applicants for courtesy appointments.

Plaintiff also unsuccessfully sought courtesy appointments from two other departments—the Department of Biochemistry and the Center for Aging—in 1996. There is no evidence that Dr. Dunn "blocked" these appointments. Plaintiff had also applied for a temporary assistant professor position within the department 'in July of 1994 and was not selected for the position.

Some academics believe it is in the best interests of both the academic community and the individuals concerned for graduates to seek employment opportunities somewhere other than where their "terminal degree" (last degree) is obtained. The reasons for this include the importance of sharing of research techniques and knowl-

edge among different institutions via recent graduates, and the belief that going elsewhere gives greater legitimacy to a student who has been taught by many of the faculty members at the institution where the degree was obtained. Many institutions (including K–State) now have general policies against hiring their own recent graduates as faculty members. There is also a concern about exploitation of recent graduates employed as post-doctoral fellows in the same lab where they have conducted research for their terminal degree. In some instances, funding of post-doctoral fellowships is limited to a maximum of three years, less any time the fellow has spent in the sponsor's lab at the time of the award.

Dr. Dunn has held the above-described philosophy since his arrival at Kansas State University as head of the Department of Anatomy and Physiology in 1990 and had advised plaintiff it would be in his best interest to seek opportunities elsewhere after graduation. It was well known in the department that Dr. Dunn is philosophically opposed to allowing graduate students to remain at the institution where they received their terminal degree. Even plaintiff was familiar with Dr. Dunn's view.

At least ten KSU faculty members in Colleges other than Veterinary Medicine received their terminal degrees from KSU. Additionally, at least five KSU faculty members in the College of Veterinary Medicine received their terminal degrees at KSU. Pl. Affidavit at ¶ 6. In his deposition, plaintiff identified Dr. Frye and Dr. Andrews as faculty members without any intervening experience in other institutions.

Dr. Gordon Andrews is in the Department of Diagnostic Medicine and Pathobiology, which is a different department than Anatomy and Physiology and which is administered by a different department head.

Of the faculty members who received their terminal degree at KSU, only Dr. Walter Cash was in the Department of Anatomy and Physiology. Dr. Cash graduated from KSU 27 years ago in 1971 with a DVM and was engaged in private practice for three years prior to returning to the university in 1974 as a graduate student and instructor. Cash received his Ph.D. at KSU in 1982 and was hired at that time by Dr. Russ Frye, who was then the head of the department, as an Assistant Professor with tenure. (University policy now precludes an award of tenure at the rank of Assistant Professor.) Dr. Frye's hiring practices were very different from Dr. Dunn's.

After plaintiff's graduation, he was hired by Dr. Quadri as a post-doctoral associate from 1993–94. In 1994, plaintiff was hired as a post-doctoral fellow by KU Professor Dr. James Voogt to conduct research under a grant from the University of Kansas Medical Center. The research was conducted under a subcontract between Kansas State University and the University of Kansas Medical Center. In the three-year period that he worked on this project, plaintiff spent approximately one month at KU performing research under the supervision of Dr. Voogt and the remaining thirty-five months performing research at Kansas State under the supervision of Dr. Quadri.

On January 31, 1996, while working as a post-doctoral fellow on this project, plaintiff applied for a full-time teaching position in the Department of Anatomy and Physiology. The deadline for accepting applications was February 1, 1996.

The announcement for the full-time teaching position stated:

The Department of Anatomy and Physiology invites applications for an Assistant Professor position in the College of Veterinary Medicine. This is a 9–month, non-tenure accruing position with a 1–year appointment; continuation is dependent upon teaching performance. The successful candidate will have a strong commitment to excellence in teaching, be able to contribute to team-taught anatomy courses for first-

year veterinary students, and be able to develop and/or utilize contemporary instructional methodologies. The position is available beginning Aug. 1, 1996. DVM degree required; DVM and PhD degrees preferred.

The search committee for the position was comprised of: Dr. Deryl Troyer, chair; Dr. Walter Cash, Associate Professor (now Professor); Dr. Howard Erickson, Professor; Dr. Jim Sharp, Assistant Professor; and Dr. Kaleem Quadri, Professor.

After applying for the position, plaintiff discussed with Dr. Cash and Dr. Troyer his intent to continue his research if hired for the full-time teaching position.

On February 27, 1996, the search committee chair forwarded to Dr. Dunn the committee's recommendation of three candidates for interviews: plaintiff, Dr. Judy Provo, and Dr. Patricia Stewart. The list was in alphabetical order, and was not in any order of preference for hire.[1]

Dr. Dunn initially declined to interview plaintiff because he was a recent graduate of the department. Dr. Dunn's report to the university's office of affirmative action proposing interviews for Dr. Provo and Dr. Stewart explained that plaintiff was not being invited to interview because his terminal degree was from the department with no other academic experience and the position was not a research position.

Dr. Patricia Stewart, a graduate of Kansas State University who also applied for the position filled by Judy Provo, was identified as an applicant proposed for interview by Dr. Dunn.

Dunn informed Deryl Troyer, a search committee member, that he was not planning on giving plaintiff an offer on the position regardless of what the committee felt.

Dr. Dunn had originally requested approval from the Dean of the College of Veterinary Medicine to make the full-time teaching position a tenure-track position. However, Dean Marler, the Dean of the College, preferred to make the position a 9–month, non-tenure accruing position for one year with continuation dependent upon teaching performance. Dean Marler believed that all new faculty positions should start out as nine-month non-tenure track positions and that the person should prove themselves before that position became a tenure-track position. Dr. Dunn knew that the position might be converted to a tenure-track position in the future and thought that the university's policy against offering faculty appointments to a person whose last earned degree is from Kansas State University applied to the teaching position. Specifically, it is the university's general policy that "tenure-track faculty appointments will not be offered to individuals who have obtained their termination degree from Kansas State University unless the individual has extensive intervening experience elsewhere. In unusual and meritorious cases, the provost may make exceptions to this policy."

When the Director of the university's Affirmative Action Office, Mr. Clyde Howard, contacted Dr. Dunn upon receipt of the recruitment form, and explained his interpretation that the university's general policy did not apply to the teaching position, Dr. Dunn agreed that plaintiff should be given an interview.

After the affirmative action recruitment report was approved with the addition of plaintiff as a candidate to be interviewed, Dr. Dunn contacted each of the three candidates to describe the position and to inquire about their continued interest in

---

1. Plaintiff asserts that he was the top choice of four out of five of the search committee members. In support, he cites a draft of the minutes from a March 8, 1996, faculty meeting, and the deposition of Dawn Anderson. Although the draft of the minutes from this faculty meeting contains a statement that "4 out of 5 committee members considered this

candidate [Dr. MohanKumar] to be their top choice, . . ." as the defendant points out this statement constitutes hearsay. It reflects a comment made by Dr. Quadri, who is now deceased, in the course of the faculty meeting. It is unclear upon what Dr. Quadri based that assertion.

the position. Plaintiff said he wanted a day or two to think about his response.

Approximately one week later, on March 25, 1996, Dr. Dunn met with plaintiff and asked if he wanted to be interviewed for the position. Plaintiff did not respond affirmatively, but asked Dr. Dunn to provide the reasons why Dr. Dunn wanted to interview plaintiff. Plaintiff told Dr. Dunn he knew Dunn had removed plaintiff's name from the list of three candidates selected by the search committee for interviews and he wanted to know why Dunn wanted to interview him if he had no intention of hiring him. Dr. Dunn responded by asking plaintiff whether he wanted to be interviewed. After this exchange occurred three or four times, plaintiff left without expressly answering Dunn's question of whether he wanted to be interviewed. After this meeting, Dr. Dunn prepared a memo to the file stating that plaintiff had withdrawn as a candidate.

Shortly after this meeting with Dr. Dunn, in March of 1996, plaintiff learned that Dr. Dunn had announced at a faculty meeting that plaintiff had withdrawn as a candidate for the position. Plaintiff did not clarify with Dr. Dunn at that time that in fact he was interested in the position. A draft of the faculty meeting minutes of March 8, 1996, contained a statement by Dr. Quadri that plaintiff was the top choice of four out of the five search committee members. Defendant Dunn deemed the statement inappropriate and had it removed from the minutes.

On or about May 15, 1996, plaintiff was notified that Dr. Judy Provo had been hired for the teaching position. The position filled by Provo was considered by Dunn to be full assistant professor within the department.

Dr. Provo was a veterinarian who was completing her master's degree in veterinary education.[2] She had not completed her master's degree at the time she was hired. Her experience and strengths were

in teaching, not research. She had seven years of teaching experience at Purdue University. Dr. Provo's experience at Purdue was considered a strength because the department would benefit from fresh ideas from another institution. She had taught microanatomy. She had experience in the development of plastinated models and her master's research was in instructional techniques for anatomy. A preferred qualification for the position was experience in contemporary instructional methodologies, and Dr. Provo's experience in this regard was unique among the candidates. Dr. Provo's pursuit of a master's degree in veterinary education verified her interest and commitment to teaching, as opposed to research, and indicated a possible willingness to remain in the teaching position for a long-term basis.

Plaintiff had three semesters of experience teaching Gross Anatomy. He had team-taught two semesters of Gross Anatomy II as a graduate student in 1992 and 1993. In the 1995 fall semester, he was hired by Dr. Dunn to assist in teaching Gross Anatomy I laboratories. He had no experience teaching microanatomy. His experience in contemporary instructional methodologies was limited to the use, not development, of plastinated models. Plaintiff was one of the individuals who had prepared, revised, and edited the Equine Dissection Guide, Second Edition 1993. This guide had not yet been converted to multi-media. Plaintiff's teaching experience in anatomy was most acceptable; his teaching evaluations while at KSU reflected very high scores including a "5", the highest possible score. Dr. Dunn did not have any personal knowledge of plaintiff's teaching abilities as he had never personally sat in on a lecture or one of plaintiff's labs. Dunn was familiar with plaintiff's desire to teach in the department based upon plaintiff's offer to teach for free. Dunn had no reason to believe

---

**2.** The record indicates that a recipient of a D.V.M. degree is referred to as "Dr.", al-

though a D.V.M. is not a Ph.D. degree.

that plaintiff was anything less than fully qualified to teach.

The starting salary range established by the university for the nine-month position was $30,000 to $35,000. Ms. Provo initially rejected the offer of employment.[3] Provo was hired at a starting salary of $45,000. Depending on time invested, if the candidate for a position in the department turns it down, then typically an offer is made to the second candidate. That was not done here.

Dr. Dunn gave Dr. Provo a preference because of her female gender[4] and did not consider plaintiff's national origin as a positive consideration.

Dunn stated that even if plaintiff had been interviewed for the position, he would have still hired Judy Provo.

Upon receiving notification of Dr. Provo's hire, plaintiff wrote to Dr. Dunn on May 20, 1996, and asked for an explanation concerning the hiring decision.

On May 21, 1996, Dr. Dunn met with plaintiff. Plaintiff asked Dr. Dunn for a written explanation concerning the hiring process. According to plaintiff, when he asked Dr. Dunn for a written explanation for his "file" concerning the hiring decision, Dr. Dunn became angry and responded, "That's just not the way we do it here. I'm not sure how you do it in India, but we don't do things that way here." Dunn told plaintiff he should not interact with his department head in this manner.

In a letter to Dunn dated May 22, 1996, plaintiff denied that he had withdrawn his application for the position filled by Provo.

In June 1996, plaintiff complained to the Dean of the College of Veterinary Medicine about "irregularities in the hiring process," but did not allege that any such

irregularities were because of his national origin.

In July 1996 plaintiff contacted Clyde Howard, Director of the university's Office of Affirmative Action, and made his first complaint of discrimination. This complaint was made approximately two months after the hiring decision for the teaching position. Plaintiff's complaint was against Dr. Dunn. Plaintiff did not make any complaints of discrimination by Dr. Dunn prior to July 23, 1996.

On or about November 13, 1996, plaintiff filed a complaint alleging discrimination on the basis of national origin with the Kansas Human Rights Commission. Plaintiff's KHRC complaint was sent to the EEOC for dual filing purposes on or about November 15, 1996. The EEOC adopted the findings of the KHRC that investigated plaintiff's charge of discrimination and issued a dismissal and notice of rights on September 24, 1997. This lawsuit was filed eighty-nine (89) days later on December 24, 1997.

In June 1997, Dr. Quadri got an NIH grant and wanted plaintiff to be appointed as a post-doctoral fellow on it. When this request was made to Dr. Dunn, Dunn rejected it, stating his reason as plaintiff was a graduate of the department.

Dunn had made comments to the plaintiff and his wife on several occasions concerning their national origin. The comments included, "Indians wear saris because you do not know how to sew," and "Indian wives should walk behind their husbands." Dunn stated that in making these comments he intended to joke with or engage in conversation with plaintiff. After being directed by the Affirmative Action Office to refrain from

---

**3.** Plaintiff cites no competent evidence to show that Dunn agreed to ask the other two applicants if they were interested in the position. Plaintiff cites certain deposition testimony of Dawn Anderson in an attempt to support such an allegation. This testimony, however, lacks sufficient foundation and it constitutes inadmissible hearsay. The cited testimony consists of Dawn Anderson reading

hand-written notations of Clyde Howard which allegedly reflect a telephone call between Clyde Howard and "Bonnie," whom Anderson identified as Dr. Dunn's office assistant.

**4.** Plaintiff has not asserted any claim of sex discrimination in this action.

comments related to plaintiff's ancestry, he stopped.

Plaintiff was hired by Kansas State University in 1997 after the provost learned that plaintiff had been diagnosed with cancer. Plaintiff was appointed to faculty status in 1998 as a result of Dr. Quadri's death. This faculty appointment facilitated plaintiff's appointment by NIH to serve as the principal investigator for the duration of the grant for which Dr. Quadri had been the principal investigator.

Plaintiff possesses physical characteristics consistent with a person of Indian ancestry that clearly distinguish him as a person of non-Caucasian ancestry; his skin tone is brown. The same is true of his wife and was true of plaintiff's former major professor, Dr. Quadri.

## II. *Summary Judgment.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

## III. *Discussion.*

Plaintiff contends the defendants discriminated against him on the basis of national origin and ancestry in failing to hire him for the assistant professor position. He also alleges discrimination in the denial of his requests for "courtesy appointments" at KSU.[5] He seeks relief under Title VII (42 U.S.C. § 2000e et seq.), the Kansas Act Against Discrimination, and §§ 1981 and 1983 of Title 42 of the United States Code.

## A. *Title VII Claim.*

Plaintiff contends that the defendants violated Title VII by refusing to hire him

because of his national origin. *See* 42 U.S.C. § 2000e–2(a)(1). In addressing such claims, courts ordinarily use the "burden-shifting" approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), under which the plaintiff must first establish a prima facie case of employment discrimination by proving that: (1) plaintiff is a member of a protected class; (2) plaintiff applied for and was qualified for an available position; (3) plaintiff was rejected despite being qualified; and (4) the position remained open as the employer continued to search for applications or the position was filled by a person not of the protected class. *Id.* at 802, 93 S.Ct. 1817. After the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant offers such a reason, the burden reverts to the plaintiff to show the defendant's proffered reason was a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. 1817.

The defendants concede plaintiff has made a prima facie case. Def. Mem. at 14. They argue that Dr. Provo was hired instead of Dr. MohanKumar because she was more qualified for the position and because plaintiff had received his terminal degree from KSU without any intervening experience. Because these are legitimate nondiscriminatory reasons, the issue is whether Dr. MohanKumar has cited evidence to show "that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual." *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995).

A plaintiff demonstrates pretext by showing either "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine,*

---

**5.** Plaintiff has withdrawn a claim for retaliatory failure to hire. *See* Pl. Resp. at 23.

450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). For example, a plaintiff may demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). However, a plaintiff's "mere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

■ Applying these standards, the court finds that a genuine issue of fact exists as to whether defendants' proffered reasons for not hiring the plaintiff were pretextual. There are inconsistencies in defendants' explanation that plaintiff was rejected because of a policy against hiring candidates who obtained their terminal degrees at KSU. Although there is nothing improper or suspect about such a policy (indeed, it was reflected in the University's general policies applicable to tenure track positions), the manner of its application in this case raises a question as to whether it was the true reason for Dr. Dunn's refusal to hire the plaintiff. As an initial matter, Dr. Dunn stated that he would not interview the plaintiff, but he apparently did intend to interview Dr. Stewart, who was also a KSU graduate. Defendants have not shown how Dr. Stewart's situation was different from that of the plaintiff. Dr. Dunn then discussed this policy with the Director of the University's Affirmative Action Office, who offered his interpretation that the policy did not apply because this was not a tenure-track position. After speaking with the Director, Dr. Dunn agreed that plaintiff should be given an interview. Dr. Dunn's conduct could thus be viewed as showing agreement that the policy did not apply to this position. To subsequently reject Dr. MohanKumar on the basis of that policy could be considered by a jury as inconsistent with Dunn's agreement that he should be interviewed. Moreover, when Dr. MohanKumar asked Dr. Dunn to explain why he wanted to conduct the interview if Dunn did not intend to hire him (as Dunn had previously indicated), Dr. Dunn refused to give him a simple straightforward answer. When plaintiff later asked Dr. Dunn to give a written explanation of the hiring decision, Dunn became angry and made a comment about plaintiff's national origin, stating, "I'm not sure how you do it in India, but we don't do things that way here." Unlike some of the other comments allegedly made by Dr. Dunn referring to plaintiff's national origin, this one bears a sufficient nexus to the hiring decision to raise a question of whether an animus against plaintiff arising from his national origin played some role in the decision not to hire him. On top of this, Dr. Dunn subsequently stated at a faculty meeting that plaintiff had withdrawn from consideration for the position, which, if plaintiff's version of events is believed,[6] was a mischaracterization of what had occurred. The court concludes such circumstances provide a basis upon which a reasonable jury could find that reliance upon the policy in question was a pretext. As such, the jury could infer that Dr. Dunn intentionally discriminated against plaintiff because of his national origin. *Cf. Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995) (a showing of pretext allows a jury to infer discriminatory intent). Considered in context, these events likewise raise a legitimate issue of pretext concerning defendants' assertion that plaintiff was not hired simply because Dr. Provo was more qualified. The evidence suggests that Dr. MohanKumar was eliminated from consider-

---

**6.** Dr. Dunn maintains that Dr. MohanKumar stated he was withdrawing from consideration for the position. Dr. MohanKumar denies this. Because such a dispute of fact is a question for the jury to determine, the court assumes the truth of plaintiff's version for purposes of summary judgment.

ation before his qualifications were ever compared to Dr. Provo's. Moreover, as plaintiff points out, the advertisement for the position stated that Ph.D. degrees were preferred, and he had a Ph.D. degree while Dr. Provo did not yet have her master's degree. Defendants contend that Dr. Provo was hired in part because of her experience in developing plastinated models, but that was not specifically mentioned in the advertisement as a desired qualification. Finally, when Dr. Provo initially declined the position, Dr. Dunn did not ask plaintiff or the other candidate whether they were interested, as was customary, but instead raised the salary offer to Dr. Provo above the range established by the university.

As the defendants point out, there is substantial evidence in the record from which a jury could conclude that Dr. Dunn refused to hire plaintiff because of a legitimate belief that the university should not hire its own recent graduates and because he viewed Dr. Provo as better suited for this particular position. But plaintiff has cited evidence from which "a reasonable factfinder could rationally find [the defendants' explanation] unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). Under the circumstances, the issue is one for the jury, and the defendants' motion for summary judgment on plaintiff's Title VII claim must be denied.

### B. *KAAD Claim.*

Defendants argue that plaintiff's claim against the university under the KAAD is barred by the Eleventh Amendment. Def. Mem. at 27. Plaintiff's response does not address this argument; the court therefore concludes it is uncontested. Accordingly, the claim under the KAAD will be dismissed.

### C. *Section 1981 and 1983 Claims.*

█ Defendants next argue that plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 are barred by the statute of limita-

tions. To the extent these claims are based on denial of "courtesy appointments" or other actions taken by Dr. Dunn between 1993 and 1995, the court agrees with the defendants. There appears to be no dispute that these denials occurred more than two years prior to the filing of this action. Plaintiff concedes that the limitations period on his § 1983 claim is two years, but argues a four-year period governs his § 1981 claim. *Citing Alexander v. Precision Machining, Inc.*, 990 F.Supp. 1304, 1308 (D.Kan.1997). This court has previously held, however, that a two-year period governs under § 1981. *Mason v. Anadarko Petroleum Corp.*, No. 97–1051–WEB, 1998 WL 166562, at *4–5 (D.Kan. Mar.2, 1998) (applying two-year statute of limitations to all § 1981 claims). *See also Lasley v. Hershey Foods Corp.*, 35 F.Supp.2d 1319 (D.Kan.1999) (same). Accordingly, any claim arising out of the denial of courtesy appointments is barred by the statute of limitations.

Insofar as plaintiff's § 1981 claim is based on the defendants' refusal to hire him for the anatomist position, such a claim is not barred by the statute of limitations. Moreover, the court rejects defendants' argument that plaintiff has failed to state a claim under § 1981 because he has not alleged the refusal to hire him was based on race. Plaintiff asserted in the Pretrial Order that "he has been subjected to unlawful discrimination based upon his Indian ancestry...." *Pretrial Order* at 4. This is sufficient to allege racial discrimination within the meaning of § 1981. *See Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Congress intended to protect identifiable classes of persons who are subjected to discrimination solely because of their ancestry or ethnic characteristics). Moreover, because *Saint Francis College* shows that the law prohibiting such discrimination was clearly established at the time in question, the court rejects defendants' argument that Dr. Dunn is entitled to qualified immunity on the § 1981 and

§ 1983 claims. Finally, the court rejects defendants' assertion that there is no evidence of intentional discrimination on the part of Dr. Dunn. For the same reasons previously expressed with regard to plaintiff's Title VII claim, the court finds there is a genuine issue of material fact as to whether Dr. Dunn intentionally discriminated against plaintiff because of his ancestry. *Cf. Sischo–Nownejad v. Merced Comm. College Dist.*, 934 F.2d 1104, 1112 (9th Cir.1991).

IV. *Conclusion.*

The defendants' Motion for Summary Judgment (Doc. 20) is GRANTED IN PART and DENIED IN PART as set forth above. IT IS SO ORDERED this 13th day of May, 1999, at Wichita, Kansas.