Terry **WILSON**, T.C. Wilson, Inc., d/b/a Wilson's Grocery, John Potts, Potts Corner, LLC, d/b/a Potts Grocery, Plaintiffs,

v.

The **PEPSI BOTTLING GROUP, INC.**, and Atlanta Retailers Association, LLC, Defendants.

Civil Action No. 1:07–CV–1030–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 30, 2009.

Matthew C. Billips, Esq., Mitchell Douglas Benjamin, Esq., Billips & Benjamin, Decatur, GA, for Plaintiffs.

Lucy Wright Rankin, Esq., Marlie McDonnell, Esq., Michael J. Bowers, Esq., David Joel Mamins, Esq., Balch & Bingham, Atlanta, GA, for Defendant Atlanta Retailers Association.

Cindy Dawn Hanson, Esq., James H. Coil, III, Esq., Yendelela Michelle Neely, Esq., Kilpatrick Stockton, Atlanta, GA, for Defendant Pepsi Cola Bottling Group.

### ORDER

ORINDA D. EVANS, District Judge.

This 42 U.S.C. § 1981 case is currently before the Court on the parties' various motions. Defendant Atlanta Retailers Association ("ARA") has filed a motion for summary judgment [Doc. # 122] and a motion in limine to exclude the testimony of Plaintiffs' expert. [Doc. # 205]. Plaintiffs have filed responses to both of these motions [Docs. # 168 and # 218], and ARA has filed replies to Plaintiffs' responses [Docs. # 207 and # 229]. Plaintiffs have filed a motion for class certification [Doc. # 278], to which both ARA and Defendant Pepsi Bottling Group ("Pepsi") have filed responses [Docs. # 297 and # 303], and to which Plaintiffs have filed a consolidated reply [Doc. # 318]. Plaintiffs have also filed a motion to supplement their response to ARA's motion for summary judgment with their own motion for partial summary judgment [Docs. # 284 and # 285]. ARA has filed responses in opposition to these motions [Docs. # 290 and # 293], as well as a motion for partial summary judgment to preclude punitive damages [Doc. # 295]. Plaintiffs have filed a response in opposition to ARA's motion for partial summary judgment [Doc. # 321], to which ARA has filed a reply [Doc. # 326]. Finally, Plaintiffs have filed a motion for reconsideration of the Court's order granting Pepsi's motion to compel [Doc. # 292] and a motion in limine to exclude the testimony of ARA's rebuttal expert [Doc. # 299]. Pepsi has filed a response to Plaintiffs' motion for reconsideration [Doc. # 294]. ARA has filed a response to Plaintiffs' motion in limine [Doc. # 311], and Plaintiffs have filed a reply [Doc. # 313].

## I. UNDISPUTED FACTS

### A. Summary of Undisputed Facts

Plaintiffs Wilson and Potts are Caucasian, native-born American citizens. Each of them own and operate a grocery store near Covington, Georgia. Both stores include gas stations. Defendant ARA is an

association whose member organizations own and operate or manage convenience stores in Georgia. The stores are either affiliated with gas stations or may include gas stations. ARA negotiates contracts with suppliers to obtain price discounts for members.

ARA was founded in 1995 by a group of Ismaili Muslims; its articles of incorporation and bylaws require that member companies be majority owned by a person of the Ismaili Muslim faith. The owners or managers are mostly immigrants to the United States; most of them came from India or Pakistan.

Defendant Pepsi had a contract with ARA in 2007 to provide its products to ARA members on a favorable basis if certain total sales volume requirements were met.

In 2007 Wilson heard about Pepsi's contract with ARA. He approached ARA concerning membership. ARA told him he was not eligible because ARA is a private organization. Plaintiff Potts is a friend of Wilson's who states he would be interested in ARA membership, if eligible. Wilson and Potts filed suit under 42 U.S.C. § 1981, claiming race discrimination by ARA (Count I) and Pepsi (Count II).

Plaintiffs' Complaint alleges that Defendants discriminated against them because they are "non-Middle Eastern" and "non-Asian." A brief subsequently filed by Plaintiffs asserts that the discrimination occurred because they are "non-Indian and non-Pakistani which may collectively be known as South Asian," and alternatively because they are "non-Ismaili." Plaintiff's Response at 2 [Doc. # 168]; Consolidated Reply Memorandum at 1 [Doc. # 318]. Plaintiffs seek certification of a class composed of those who desire to join ARA but cannot do so on account of its discriminatory policies.

ARA denies discriminating against Plaintiffs on account of their race. It does state that its members must be Ismaili Muslims.

B. *Ismaili Islam*

Ismaili Islam is described in the Affidavit of Dr. John Esposito, Esposito Deposition [Doc. # 254, Exh. 2], a professor of Islamic studies. Esposito has impressive credentials in that area. He concludes that Ismaili Islam is a religion, not a race. Plaintiffs have not moved to strike his affidavit. They do criticize the affidavit and have countered with their own expert's declaration attesting to Ismaili Islam's status as a race. The Court finds the facts in Dr. Esposito's affidavit helpful in resolving this case. Portions of Esposito's affidavit are reproduced as follows:

> Race, unlike religion, is an immutable characteristic that one is born with and which one has no control over. The most accepted manner of determining one's race is by examining physical traits, such as skin color, facial features and hair. Essentially, racial classifications distinguish groups of people on the basis of a common set of physical characteristics. One cannot change his/her race.

> Religion, as opposed to race, is not based on physical characteristics. Instead, religion is a set of common beliefs and practices generally held by a group of people. Although most people are "born into" a religion as a result of their parents' faith, religion is not an immutable characteristic; people can change, or convert, from one religion to another. People's religious beliefs and practices can change; their race cannot. Members of the same religion do not necessary [sic] share a common ancestry or biological distinction, such as members of the same race. Further, members of the same race can be members of various religions.

Ismaili Islam has all the characteristics of a religion, and is clearly not a race. Ismaili is a branch of the Shia sect of Islam.

Islam is the second largest religion in the world after Christianity. It is a monotheistic religion that originated in the 7th Century with the prophet Muhammad. Muslims, the adherents of Islam, follow the teachings of the Holy Koran, which they believe God revealed to Muhammad, God's prophet. There are Muslims of almost every race in the world. There are 56 countries in which Muslims constitute the majority. The largest communities are found throughout Africa and Asia. Muslims number approximately 1.2 billion, with about twenty percent of all Muslims living in Arab countries.

The Ismaili Muslims make up approximately 2.5% of the total Muslim population of the world. Ismailis trace their origin back about 1400 years, when conflict among the Shia Muslim community arose regarding the successor of the Imam Jafar As–Sadiq. While most Shia Muslims followed his youngest son, the Ismailis gave their allegiance to his eldest son, Ismail, from whom they got their name. Since that time, the Ismailis have been led by a living, hereditary Imam. They currently follow the 49th Imam, his Highness Prince Karim al-Hussayni Aga Khan, who is a direct lineal descendent from the Prophet Muhammad. Also, numerous followers of the Hindu religion converted to Ismaili Islam in the 13th century.

While many Ismailis can trace their heritage to Africa or Asia, significant Ismaili populations also exist in Europe and North America. Although many Ismaili Muslims can trace their heritage to India, they make up a very small percentage of India's population.

India is a country with a population of approximately 1.1 billion. Approximately 80% of India's population adheres to the Hindu religion. India also has significant populations of Muslims, Christians, Sikhs and Buddhists. Muslims make up about 15% of the population in India, with Shia Muslims accounting for about 3%.

Pakistan is a country with a population of approximately 164 million people. In 1947, a significant movement of Muslims from India to Pakistan (and the movement of Hindus and Sikhs into India) resulted in its current 96% Muslim population. Approximately 80% of the Muslims in Pakistan are Sunni Muslims, while only about 20% are Shia Muslims (of which a small minority is Ismaili).

Both India and Pakistan are countries within the continent of Asia, which is the world's largest and most populous continent. Asia has approximately 4 billion people and contains more than 60 percent of the world's current human population. Asian countries contain people of numerous races and religious. Asian countries contain a significant population of adherents of the Abrahamic religions of Judaism, Christianity, and Islam. Asian countries also have millions of practitioners of Hindu, Buddhism, Sikhism, Jainism, Confucianism, Daoism, Shinto and Zen Buddhism. Asia also contains people of almost every race present in the world. . . .

Today Ismaili Muslims live in approximately 25 different countries. Depending on their location, Ismailis speak various languages and have differing cultural practices. For example, there are numerous Ismail is in the Republic of Tajikistan who are Caucasian, speak Russian and participate in traditional Russian culture. Similarly, there are numerous Ismaili Muslims in China who look Chinese, speak Chinese and participate in traditional Chinese culture.

Ismailis have no true religious shrine or fixed place of pilgrimage; Ismailis worship in *Jamatkhannas,* which are found throughout the world. The Ismaili's current Imam, a graduate of Harvard University, resides in France and travels the world to be with his followers. The current Imam is the founder and Chairman of the Aga Khan Development Network ("AKDN"), one of the largest private development networks in the world, which supports philanthropic efforts around the world working toward social, economic, and cultural development. The AKDN is headquartered in Geneva, Switzerland and dispenses over $200 million annually to the poorest developing parts of the world, regardless of religion, national origin, or gender. The AKDN includes hospitals, universities and foundations that tie together the extensive Ismaili Diaspora community.

Esposito Affidavit at 3–7 [Doc. # 254 Exh. 2].

Plaintiff's expert Professor John Tehranian is a professor of law who teaches courses on race discrimination and constitutional law. Tehranian Declaration at ¶¶ 3–4 [Doc. # 168–3]. His academic credentials are impressive. White identity is a particular focus of his scholarship. Tehranian does not have special expertise as to the history or characteristics of Ismaili Muslims; his declaration relies on literary sources he has examined which provide this information. *See id.* at ¶¶ 13–19. He concludes that under Supreme Court precedent Ismailis are a race or perhaps both a race and a religion. *Id.* at ¶¶ 21, 28. His reasoning for this conclusion is that while expanded notions of white identity over the past century would suggest that persons of Arab descent are white, it is clear from literature existing in the 19th century that Muslims, including Ismaili Muslims, were not considered white. *Id.* at ¶ 34. Tehranian states that the tendency at that time was to classify non-white groups as separate races. *Id.* at ¶ 36. He cites numerous literary references as proof. *See id.* Tehranian concludes that, because the Supreme Court's ruling in *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987) held that the relevant time frame for defining race was when § 1981 was enacted (in 1866), Ismaili Muslims should be classified as a race. *Id.* at ¶¶ 11–13. The declaration further concludes that even under contemporary understandings of race, Ismailis still would constitute a race. *Id.* at 22–27. Tehranian's reasoning here is that in modern times race is defined more along lines of ethnicity defined by common interests, habits or characteristics. *Id.* at 22. Again, he cites literary sources. *See id.* at ¶¶ 22, 26–27.

ARA has moved in limine to strike Tehranian's affidavit. For the reasons set forth below, the motion will be granted.

### C. *ARA*

ARA was founded in 1995. Its founders were convenience store owners of the Ismaili Muslim faith who had immigrated to the United States. Jaffer Deposition at 49 [Doc. # 151].

Virtually all of ARA's members are immigrants to the United States from India or Pakistan. Because the nation of Pakistan was carved out of India in 1947, it is likely that all or virtually all members are of Indian ancestry. ARA does have a few members who came to the United States from East Africa, though they are of Asian (probably Indian) ancestry. Panjwani Deposition at 146–48 [Doc. # 148]; Lakhani Deposition at 48–49 [Doc. # 266].

Membership is open to Ismaili Muslims who have a majority share of ownership in a convenience store in Georgia, or manage a convenience store in Georgia pursuant to a management contract. ARA Amendment and Restatement of Charter/Articles

of Association at 4 [Doc. # 122 Exh. G]. The store is considered the ARA member, not the individual owner or manager. *Id.* at 5. However, the majority owner or manager is considered the "primary member" for the store. *Id.* For matters on which the entire membership votes, each member store has one vote. *Id.* at 2. If a member store ceases to be eligible for membership, i.e., it becomes majority-owned or managed by a non-Ismaili, the store's membership in ARA is terminated. *Id.* at 5–6.

ARA's purposes are to foster Ismaili business development, encourage unity and networking among members, negotiate favorable vendor contracts for ARA members, and provide technical and professional support to the membership. *Id.* at 3.[1] ARA is maintained as a not-for-profit organization, although the IRS has rejected ARA's application for exemption from income tax based on non-profit status. *See* IRS letter at 1 [Doc. # 168 Exh. 4]. The IRS letter reflects ARA's self-description as a non-profit organization. *Id.* at 1–2. The letter also reflects the private nature of ARA, in that membership is limited to Ismaili Muslims. *Id.* at 2. Further, the letter suggests that part of ARA's purpose is to promote mutual support among Ismaili immigrants: "[y]ou state that virtually all your members were born outside of the United States and face challenges in adapting to U.S. culture and building successful businesses." *Id.* The

IRS rejected ARA's application for a non-profit tax exemption because of its stated limitation on membership, provision of benefits to members only, and the commercial nature of its activities. *Id.* at 8–10.

The organization also offers its members other services. ARA publishes a monthly newsletter with news articles and information about new contracts, as well as tips for running a successful convenience store. [Doc. # 151 at 46–47]; *see also* Exh. 1 to Nanjee Deposition [Doc. # 147]. Some of ARA's revenue comes from advertisements in the newsletter. Jaffer Deposition at 130 [Doc. # 151]. ARA also hosts seminars on topics relevant to its membership, such as check cashing and regulations regarding the sale of over-the-counter medicines. *Id.* at 47–48. In addition, ARA makes charitable contributions. Painter Deposition at 36 [Doc. # 150]. Despite limiting its membership to those of the Ismaili Muslim faith, ARA does not hold religious services or have a religious element in its work. *Id.* at 36–37; Jaffer Deposition at 48–49 [Doc. # 151]. However, the monthly newsletter does contain religious greetings and references to Ismaili religious holidays. *See* [Doc. # 122 Exhs. I, J, K].

ARA does not actively solicit members through advertising or publications. Jaffer Deposition at 46 [Doc. # 151]. Rather, potential members learn about the organization through word-of-mouth, often at a jamat khana.[2] *Id.* at 44, 46.

---

1. One of ARA's founders, Anwar Kapadia, was quoted in a newspaper article as saying, "[e]very community has its own association: Koreans have their own association; Chinese have their own association; Jews have their own association. We are the new community in this country. Everybody has the same culture and thinking. It's just like a business, a partnership with your own people." Atlanta Journal–Constitution Article, December 4, 2002 at 1–2 [Doc. # 168 Exh. 3]. Kapadia further said that ARA, as of 2002, was not ready to accept non-Ismaili members. "We

are not in a position to include them, because if you're not strong in your own house, you can't build on that foundation. We have not yet achieved our goals." *Id.* at 2. Finally, Kapadia said that "[m]ost gas stations are 24–hour stations. The South Asian communities don't mind working that many hours." *Id.*

2. Jamat khana is a place of worship for Ismaili Muslims. In addition to prayer services, jamat khanas host educational and other activities. Jaffer Deposition at 27–29 [Doc. # 151]. Jamat khanas are not open to the

ARA's Honorary Secretary (a position on the Board of Directors) has ultimate responsibility for membership. Panjwani Deposition at 12 [Doc. # 148]. On a day-to-day basis ARA's office manager has this responsibility. Aziz Panjwani was the office manager in 2007. In 2007 his assistant Munira Lakhani processed incoming membership applications and fielded in-person and telephone requests for information about membership requirements. Lakhani Affidavit at 2 [Doc. # 207–9]; Lakhani Deposition at 26 [Doc. # 266].

If someone calls or approaches ARA in person about membership, Lakhani's practice is to say "Ya Ali madad" to the individual. Lakhani Deposition at 26 [Doc. # 266]. "Ya ali madad" is a phrase meaning "May Ali help you?". *Id.* at 50. It is a combination of Arabic and three Indian languages, Urdu, Gujarati, and Hindi. *Id.* at 50–51. It is traditional for those in the Ismaili community to greet one another with "Ya Ali madad?". *Id.* at 63–64; Panjwani Deposition at 127 [Doc. # 148]. If Lakhani does not receive the correct response to "Ya Ali madad?" from a caller inquiring about membership, she asks the person if he or she is Ismaili. Lakhani Deposition at 26 [Doc. # 266]. If the caller is not Ismaili, Lakhani explains that ARA is only open to Ismailis. *Id.* at 26–27.

Lakhani is also responsible for screening applications, including the required attachments. A potential member must fill out a one-page application form and submit copies of his or her driver's license, articles of incorporation, and business license. *Id.* at 23. There is also an annual membership fee. *Id.* at 25. Although potential members must be Ismaili in order to join ARA, the application form itself does not ask the applicant whether he or she is Ismaili. *Id.*

at 27; Panjwani Deposition at 17 [Doc. # 148].

Lakhani does the initial review of the application and may receive input from others on the staff on the question of whether it is clear enough that the applicant is Ismaili. Lakhani Deposition at 72 [Doc. # 266]. Sometimes she or other staff members may also know a membership applicant personally, either from the community or from a jamat khana. Panjwani Deposition at 33, 51 [Doc. # 148]. In such a situation, it is clear that the applicant is Ismaili. *Id.* The application form asks for a reference of an existing ARA member, which is another way ARA can determine if the applicant is Ismaili. *Id.* at 33. The applicant's last name may also be an indicator, though it is not definitive. *See* Painter Deposition at 16 [Doc. # 150]. As Afroz Painter, President of ARA, testified in his deposition, some last names are typically Ismaili, which may help the ARA staff to verify that an applicant is Ismaili. *See id.* However, if it is unclear whether an applicant is Ismaili, Lakhani will call the applicant to clarify. *See, e.g.,* Lakhani Deposition at 36–37 [Doc. # 266].

As of August 2007 there were a total of 858 active ARA members. Panjwani Affidavit at ¶ 7 [Doc. # 122, Ex. L]. After Plaintiffs challenged whether Ismaili status was a genuine requirement for membership in ARA, ARA sought to obtain affidavits from each member attesting to his or her Ismaili status. ARA held a general membership meeting in August 2007 and asked those present to sign affidavits. Lakhani Deposition at 93, 95 [Doc. # 266]. Subsequent to the meeting, letters were sent to those who had not signed affidavits and as a result a few more affi-

general public. Martin Deposition at 84 [Doc. # 286]. There are four jamat khanas in

the greater Atlanta, Georgia area.

davits were received. *Id.* at 93–95. ARA obtained 766 affidavits from a total of 858 active ARA members, attesting to the member's Ismaili faith. Panjwani Affidavit at ¶ 7 [Doc. # 122 Exh. L]. Also, ARA subsequently obtained 109 additional affidavits from new members and members who renewed their membership. *Id.* at ¶ 8. 897 member affidavits are attached to ARA's Motion for Summary Judgment filed March 17, 2008. *See* [Doc. # 122].

Aziz Panjwani, ARA's executive officer from August 2003 through February 2008, explains in his affidavit dated March 5, 2008 that while attempting to get affidavits from ARA members, he discovered that "there were 70 members who had sold their stores, closed their stores, or decided to withdraw from their ARA membership." Panjwani Affidavit at ¶ 10 [Doc. # 122 Exh. L]. After adjusting the membership list to subtract the 70 inactive members, there were 23 ARA members on the active membership list who had not sent in affidavits despite being asked to do so. Panjwani's affidavit, paragraph 20, states that of the 23 remaining ARA members, he personally knows that twelve of them worship at the Jamat khana in Decatur, Georgia. Also, he personally knows that two of them worship at the Duluth Jamat khana and that one attends that Fayetteville Jamat khana. Also, his affidavit states that while he was attempting to get member affidavits he learned for the first time that ARA member 1665 was killed in a robbery at his store, ARA member 590 was in the hospital, and ARA member 289 had had his telephone disconnected and no new number had been provided to ARA. Thus, ARA has been unable to obtain affidavits from four of its members concerning their adherence to the Ismaili faith. At the same time, there is no evidence that ARA has any members who are not Ismaili.

### D. *ARA–Pepsi Contract*

Because of its size, ARA is able to negotiate favorable contracts with vendors and suppliers. [Docs. # 122–2 at ¶ 56, # 166 at ¶ 56]. The contract at issue in this case is an agreement with Pepsi Bottling Group ("Pepsi"). In 2007, ARA and Pepsi signed a two-year contract under which participating ARA member stores would provide two-to-one refrigerated space for Pepsi products over Coca–Cola products. [Docs. # 122–2 at ¶¶ 62, 63, # 166 at ¶¶ 62, 63]. Pepsi products would also be placed in the "first position" in display cases. [Docs. # 122–2 at ¶ 64, # 166 at ¶ 64]. In return for this favorable treatment of Pepsi products, Pepsi agreed to provide to ARA "conversion funding" of $1 million and "base funding" of $2.00 per case of certain Pepsi products. [Docs. # 122–2 at ¶¶ 65, 67, # 166 at ¶¶ 65, 67]. ARA in turn sent rebate checks to those member stores that agreed to participate in the program.[3] [Docs. # 122–2 at ¶ 68, # 166 at ¶ 68]. Under the contract, half of ARA's $1 million conversion funding was dependent on ARA member stores reaching a combined sales volume of 1.1 million cases of the designated Pepsi products. ARA–Pepsi Customer Development Agreement at 6, Bates Stamp PBG0000510 [Doc. # 122 Exh. N]. If ARA failed to meet this goal by the end of 2008, a pro-rated portion of the conversion funding would have to be returned to Pepsi. *Id.* ARA elected to terminate the contract after only one year. [Doc. # 303 at 11]. ARA gave Pepsi notice of termination on December 20, 2007, and the cancellation of the contract was effective January 19, 2008. [Doc. # 122 at 53 n.

---

**3.** The contract with Pepsi did not require ARA to distribute the guaranteed half of the conversion funding to participating members. *See* ARA–Pepsi Customer Development Agree- ment [Doc. # 122 Exh. N]. However, ARA did distribute at least a part of the "conversion funding" to those members who agreed to participate and abide by Pepsi's terms.

5]. ARA then negotiated a 2008 contract with Coca Cola. [Doc. # 303 at 11].

### E. *Plaintiffs*

Plaintiff Terry Wilson ("Wilson") is a male Caucasian who was born in Covington, Georgia. He owns a grocery store near Covington. [Docs. # 122–2 at ¶¶ 73, 75, # 166 at ¶¶ 73, 75]. The store is named "Wilson's Grocery". It carries fishing and hunting supplies, beer and wine, soft drinks, groceries and other items. Wilson Deposition at 5, 51–53, 58 [Doc. # 126]. It has a restaurant; it also sells gasoline. *Id.* at 70–71. Wilson's Grocery has contracts with both Coca–Cola and Pepsi. [Docs. # 122–2 at ¶ 79, # 166 at ¶ 79].

John Potts ("Potts") is Caucasian and was born in Jasper County, Georgia. Potts Deposition at 15 [Doc. # 124]. He owns Potts Grocery, which is similar in nature to Wilson's Grocery. It is in the same general geographic area as Wilson's Grocery.

### F. *Wilson's Contacts with ARA*

In February or March 2007, Wilson mentioned to his Coca–Cola sales representative, Ricky, that the price of Pepsi–Colas had gone up. Ricky commented that Pepsi had entered into a contract with ARA, which he identified as "a Pakistan and Indian association." Wilson Deposition at 181 [Doc. # 126]. Wilson then asked Dennis, his Pepsi representative, if he could join ARA. Dennis later called Wilson back and, purporting to quote his supervisor, said that an "American American, born American" could not join ARA. *Id.* at 183. Wilson then called Lisa Dornellas, a Key Account Manager at Pepsi

(and also Dennis's supervisor). She told Wilson ARA was a Muslim organization. Dornellas Deposition at 103 [Doc. # 149]. She also said, ". . . and he [Wilson] became angry, hostile, said something to the effect of Americans, did we know what we were doing to Americans or—and I was concerned about where he was going in the conversation so I ended the conversation." *Id.* at 103.[4]

Wilson next called ARA and spoke to the woman who answered the phone. She gave him ARA's fax number so he could send in a request for an application. She then transferred him to a man in the office. Wilson Deposition at 194 [Doc. # 126]. Wilson had difficulty recalling the substance of their conversation in his deposition. *See id.* at 187–194. He did testify that he told the man he was "an American" and that the man told him he could not join. *Id.* at 189. Wilson then faxed a request for an application but got no response. *Id.* at 195. He also called ARA two more times, but "[t]hey never answered; they just picked up and put the phone back down." *Id.* at 191.

Wilson consulted a lawyer. *Id.* at 200. Following that he went to ARA's office carrying a completed application, plus other required documents (Articles of Incorporation, business license, driver's license, $75 check). He had a recorder hidden in his shirt pocket. Wilson spoke to Aziz Panjwani, ARA's office manager. The transcript of Wilson's recorded conversation with Panjwani reflects the following:

Panjwani: Hello.

Wilson: Hey, how are you. I'm probably, I'm trying, I was on the internet and I was looking and I own a conven-

---

4. Wilson had a further conversation with Dennis which Wilson covertly tape-recorded. Wilson Deposition [Doc. # 126 Exh. A (transcript of conversation)]. During that conversation Wilson quoted his own previous comments to Ms. Dornellas as follows: "I asked her I said Lisa how come that ya'll negotiated that kind of contract with them and ya'll are killing the American stores." *Id.* at 1.

ience store and it said Atlanta Retail where y' all offer, you know, benefits and rebate checks. Am I eligible to join?

Panjwani: This is a, this is a, this is only for the . . .

Wilson: I'm sorry?

Panjwani: This is a, this is a private . . .

Wilson: Is it for foreigners, and stuff like that? If that's what it—

Panjwani: It's private, yeah.

Wilson: It's private? Okay

Panjwani: Sorry about that.

Wilson: I noticed it was on the internet and it didn't really say.

Panjwani: Oh it was on the internet? OK, I didn't know that. I sorry about that.

Wilson: OK, thank you.

[Doc. # 122 Exh. R]; [Doc. # 168 at 36]. Wilson left the ARA office after this conversation and took the tape of his conversation to his attorneys. [Docs. # 122–2 at ¶¶ 103, # 166 at ¶ 103].

Plaintiff Potts, who owns Potts' Grocery, learned about ARA from Wilson. Potts Deposition at 13, 109 [Doc. # 124]. Wilson told Potts that there was no point in him trying to join because Potts, like Wilson, would not be eligible for membership. *Id.* at 13. Potts never sought to apply for membership in ARA.

### G. *Relief Sought*

Wilson and Potts filed this suit on March 30, 2007. They seek compensatory and punitive damages, plus an award of costs, expenses of litigation and reasonable attorneys' fees under 42 U.S.C. § 1988. [Doc. # 1–5 at ¶ 47]. They seek an injunction requiring ARA to admit non-Ismailis and/or non-South Asian convenience store owners as members and specific perform-

ance of the contract with Pepsi for the same duration that it was available to ARA members. *Id.*; [Doc. # 318 at 33–34].

### II. *Legal Discussion*

#### A. *Motions in Limine*

■ The Court will grant a motion in limine to exclude evidence only if the evidence in question is clearly inadmissible. *Plair v. E.J. Brach & Sons, Inc.*, 864 F.Supp. 67, 69 (N.D.Ill.1994). The moving party has the burden of proving that the evidence sought to be excluded is inadmissible. *Id.*

#### 1. *ARA's Motion in Limine [5] to Exclude the Expert Testimony and Report of John Tehranian*

Professor Tehranian's declaration concludes that Ismaili Muslims would have been considered a non-white, separate race by the drafters of § 1981 because 19th century literature (and earlier literature) shows that this was the prevailing view at that time. Tehranian Declaration at ¶¶ 13–20 [Doc. # 168–2].

ARA argues that Tehranian's opinion that Ismaili Muslims are a race is an improper legal opinion, that he is not qualified to give expert testimony on the subjects at issue in this case, that his opinions are unreliable because he lacks expertise and an adequate foundation for his opinions, and that his opinions are irrelevant because Plaintiffs' complaint does not include a claim for discrimination on the basis of non-Ismaili status. [Doc. # 205 at 2–3].

##### a. *Tehranian is not qualified to give expert testimony in this case*

Federal Rule of Evidence 702 provides that:

**5.** ARA wants Tehranian's affidavit to be stricken and not considered in deciding its motion for summary judgment.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Thus, expert testimony will be admissible under Rule 702 when: (1) the expert is qualified to testify, (2) the expert's methodology is reliable, and (3) the expert's testimony assists the trier of fact. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir.1999). Under the plain language of Rule 702, an expert may be qualified through training or education, as well as through experience. *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir.2004) (en banc). However, the expert's qualifications must relate to the matters he will address in his testimony. *Allison*, 184 F.3d at 1309 (expert testimony is admissible when "the expert is qualified to testify competently regarding the matters he intends to address"). The party offering the expert has the burden of proving the expert's qualifications. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir.2005).

■ Having reviewed Tehranian's publications and Plaintiffs' other evidence purporting to qualify Tehranian, the Court concludes that Tehranian is not qualified to offer expert testimony on whether Ismaili Muslims constitute a race. Tehranian's publications and speaking engagements demonstrate that the area of his expertise is in the construction of white identity, but not racial identity in general. Most importantly, Tehranian has no specialized knowledge of Ismaili Muslims or Islam in general. Tehranian's law review articles and forthcoming book focus on the expansion of the legal definition of "white" over the past century, specifically in regard to persons of Middle Eastern descent. However, Tehranian's research and writing do not reflect a focus on the key issue under § 1981 in this case, i.e., general historical understandings of whether Ismaili Muslims were a race at the time § 1981 was passed. As a result, Tehranian is not qualified to offer expert testimony in this case.

### b. Tehranian's conclusion that Ismailis are a race under section 1981 is not admissible

Even if Tehranian were qualified to provide expert testimony, his conclusion that Ismailis are a race under § 1981 would not be admissible here. Under Federal Rule of Evidence 704, opinion testimony that is "otherwise admissible" is not objectionable simply because it "embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704(a). As the United States Court of Appeals for the District of Columbia Circuit has explained:

Whether expert opinion testimony is "otherwise admissible" depends, in part, on whether it will "assist the trier of fact in either understand[ing] the evidence or determin[ing] a fact in issue." *See* Fed. R.Evid. 702. Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not "otherwise admissible."

*Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C.Cir.1997).

■ In this case, part of Tehranian's declaration concludes that under relevant Supreme Court precedent Ismaili Muslims are a race under § 1981. [Doc. # 166–2 at ¶¶ 13–19]. This legal conclusion is based on factual assumptions which have been found to be unreliable. Also, it is a legal conclusion which is ultimately reserved for the Court. As a result, Tehranian's opinion that Ismailis are a race for the purposes of § 1981 is inadmissible.

### 2. Plaintiffs' Motion in Limine to Exclude the Expert Testimony of Richard Martin

ARA has retained Dr. Richard Martin as an expert in this case. Plaintiffs took Martin's deposition. [Doc. # 286]. Plaintiffs argue that Martin's testimony should be excluded because his expertise is in the area of religious studies, not racial identity, and therefore is not relevant to the question of Ismaili racial and religious identity. [Doc. # 299 at 1–2]. ARA claims that Martin's position as a Professor of Religion at Emory University and numerous publications on the topic of Islam qualify him as an expert in this case. [Doc. # 311 at 3–5].

A review of Martin's affidavit, attached as an exhibit to his deposition, reveals that his testimony is intended primarily to rebut Tehranian's opinions. Much of Martin's affidavit is dedicated to explaining his disagreement with Tehranian's opinion regarding Ismaili racial identity. Those portions of his affidavit that do not specifically rebut Tehranian's opinion are duplicative of John Esposito's affidavit. However, the Court finds that Martin is qualified as an expert and that the facts in his affidavit are helpful to the Court. Therefore, the motion in limine is denied, although the content of Martin's affidavit will not be specifically discussed in this Order.

### B. Summary Judgment Motions

The Court will grant summary judgment when "there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a gen-uine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

Only after the moving party meets this initial burden does any obligation on the part of the non-moving party arise. Chanel, Inc. v. Italian Activewear of Fla., 931 F.2d 1472, 1477 (11th Cir.1991). At that time, the non-moving party must present "significant, probative evidence demonstrating the existence of a triable issue of fact." Id. If the non-moving party fails to do so, the moving party is entitled to summary judgment. United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir.1991).

All evidence and justifiable factual inferences should be viewed in the light most favorable to the non-moving party. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1532 (11th Cir.1987); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir.1987). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Four Parcels of Real Prop., 941 F.2d at 1438 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

### 1. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have filed a motion to supplement their response to ARA's summary judgment motion with their own motion for partial summary judgment on the claim of discrimination against non-Ismailis. [Docs.

# 284 and # 285]. ARA opposes Plaintiffs' motion to supplement. [Doc. # 290].

Plaintiffs' motion for summary judgment reiterates their claims of discrimination against non-Ismailis, and does not raise any new arguments. *See* [Doc. # 284]. In addition, Plaintiffs' motion to supplement their summary judgment response was filed on October 23, 2008, more than five months after their initial response to ARA's motion for summary judgment was due and almost four months after the deadline for filing summary judgment motions. *See* [Docs. # 158, # 284]. Because Plaintiffs' motion for partial summary judgment is untimely and raises no new arguments, Plaintiffs' motion to supplement their summary judgment response is denied.

### 2. *ARA's Motion for Summary Judgment*

ARA has filed a motion for summary judgment on the merits, arguing that there is no genuine issue of material fact and that ARA is entitled to judgment as a matter of law. Plaintiffs oppose the motion and contend that there are genuine issues of material fact which must be resolved at a trial.

Plaintiffs brought their claim against ARA under 42 U.S.C. § 1981. Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of all persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

While the statute does not expressly say so, it is well established that § 1981 concerns race discrimination. *Runyon v.* *McCrary*, 427 U.S. 160, 168–69, 96 S.Ct. 2586, 2594–95, 49 L.Ed.2d 415 (1976).

Plaintiffs' § 1981 claim against ARA has changed since the Complaint was filed. In the Complaint, paragraph 39, Plaintiffs alleged that ARA discriminated against them because they are "non-Middle Eastern and non-Asian." Plaintiffs did not amend their Complaint. Instead, in their brief filed in opposition to ARA's motion for summary judgment they argue that they were discriminated against because they are "neither Indian nor Pakistani, which may collectively be known as South Asian" and "[s]econd, *either in addition to* such discrimination *or in the alternative*, Plaintiffs have been discriminated against on the basis of race because the Ismailis constitute a 'race' [under] 42 U.S.C. § 1981." (emphasis in original). Plaintiffs' Brief in Opposition to ARA's Motion for Summary Judgment [Doc. # 168 at 2].

In its reply in support of its motion for summary judgment, ARA argues that the Court should disallow Plaintiffs' claim of discrimination on account of being non-Ismaili because it is not in the Complaint. [Doc. # 207 at 6–9]. Alternatively, ARA argues that Plaintiffs' claim that ARA discriminated against them on account of their non-Ismaili status is not actionable under § 1981, because Ismaili Islam is a religion, not a race. [Doc. # 122 at 31–33]. ARA further argues that Plaintiffs' claim that they were discriminated against because they are not Indian or Pakistani ("non-South Asian") is not supported by evidence. [Doc. # 207 at 17–21]. In support of its claim that Ismaili Muslims do not constitute a race ARA cites Esposito's affidavit. [Doc. # 122 at 31–33].

Plaintiffs respond that both sides have conducted full discovery on Plaintiffs' claims that they were discriminated against on account of being non-Ismaili; there would be no prejudice to either side in considering this claim. [Doc. # 168 at

2–5]. Plaintiffs argue that as evidenced by Professor Tehranian's affidavit, Ismaili Muslims are a race; further, whether the Ismaili people constitute a religion or a race is a false dichotomy. *Id.* at 13–15, 29–31. Plaintiffs argue alternatively that ARA's argument that Plaintiffs were excluded because they were non-Ismaili is a pretext for discriminating against Plaintiffs because they are non-Asian. *Id.* at 35. In making their alternative argument Plaintiffs rely on the inferential mode of analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* at 61–62.

ARA replies that Plaintiffs' alternative argument is not viable because the *McDonnell Douglas* type of analysis cannot be used in a § 1981 action which is not an employment case.

Preliminarily, the Court will address the question whether Plaintiffs' claim that they were discriminated against on account of being non-Ismaili is foreclosed because it is not in the Complaint. Because the parties appear to agree that they have had full discovery on this claim, it seems there would be no prejudice in allowing it to proceed. Thus, the Court in its discretion will consider the claim in this Order. *See Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1077 (11th Cir.2003) (allowing affirmative defense to be presented because it had been raised and "discussed at length at the pretrial conference"); *Streeter v. Hopper,* 618 F.2d 1178, 1180 (5th Cir.1980)[6] (hold-

ing that the defendant consented to inclusion of the plaintiffs' endangerment claim because the claim was the focus of two evidentiary hearings and the defendant did not object).

Plaintiff Potts' claim is clearly deficient because he never sought to form a contract as required by § 1981. *Morris v. Office Max, Inc.,* 89 F.3d 411, 414–15 (7th Cir.1996) ("A claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities."). Therefore, ARA's motion for summary judgment will be granted as to Potts' claim.

The Court understands Wilson's first argument to be that ARA's limitation of membership to Ismailis only constitutes a *per se* violation of § 1981. To resolve this issue, the Court will need to ascertain if Ismailis were considered a race when § 1981 was passed.[7] When considering whether a plaintiff[8] in a § 1981 case was discriminated against because of his or her race, courts look to the understanding of race that existed when § 1981 was drafted. *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 610, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987). As the *Saint Francis* Court noted, "[p]lainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law." *Id.* at 610, 107 S.Ct. at 2026–27. In order to determine wheth-

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1206 (11th Cir.1981) the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the United States Court of Appeals for the Fifth Circuit handed down by the close of business on September 30, 1981.

**7.** ARA asserts that the proper inquiry here is whether the 1866 Congress intended to protect Ismailis when they passed § 1981. [Doc. # 311 at 3]. Because Ismailis were not yet present in the United States in the 19th Cen-

tury, ARA argues, Congress could not have intended § 1981 to extend to them. *Id.* at 10. However, as the following discussion will address, this is not the proper approach in defining race under § 1981.

**8.** The Court notes that here ARA is the Defendant, not the Plaintiff. Even if this difference were to require a contemporary rather than historical focus the result would be the same, based on the facts set forth in Dr. Esposito's affidavit.

er the plaintiff in *Saint Francis,* an Iraqi man, would not have been considered Caucasian in the 19th Century, the Court looked at dictionaries and encyclopedias from that period. These sources defined race narrowly, and often in terms of ethnic groups. *See id.* at 610–12, 107 S.Ct. at 2027. For example, the "Ninth Edition of the Encyclopedia Britannica also referred to Arabs, Jews, and other ethnic groups such as Germans, Hungarians, and Greeks as separate races." *Id.* at 611–12, 107 S.Ct. at 2027 (internal citations omitted). Nineteenth Century dictionaries defined race as people descended from the same "stock" or descendants of a common ancestor. *Id.* at 610–11, 107 S.Ct. at 2027. Based on these definitions, the *Saint Francis* Court concluded that § 1981 at a minimum "reaches discrimination against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens.*" *Id.* at 613, 107 S.Ct. at 2028 (internal quotation marks omitted).

■ Applying these definitions and understandings to Ismaili Muslims, it is clear that they would not have been considered a separate race in the 19th Century.[9] Ismaili Muslims represent a small portion of the worldwide Muslim population. [Doc. # 122–5 at 4]. The Ismaili branch of Islam formed 1400 years ago, when a group of Muslims gave their allegiance to Ismail, the older son of the Imam Jafar As–Saqir, believing Ismail to be the Imam's proper successor. *Id.* at 4–5. Ismaili populations can be found in Africa, Asia, Europe, and North America. *Id.* at 5. There are significant Ismaili populations in Tajikistan and China, as well as in India and Pakistan.

*Id.* at 5, 6. Ismailis do not have a homeland or a fixed place of pilgrimage. *Id.* at 6.

Ismailis therefore cannot be considered to share a common ethnicity or national origin. There is no indication that they share a common ancestor or are descended from common "stock." Although Plaintiffs cite to books and other documents referring to groups of Ismailis as a "race," [Doc. # 168 at 13–15], this does not demonstrate that Ismailis have a common ethnicity or ancestor. The test under *Saint Francis* is not whether various contemporaneous sources suggest that a given group was a separate race, but rather whether the plaintiff's race or ethnicity fits into the 19th Century definition of race. *See* 481 U.S. at 610–11, 107 S.Ct. at 2026. Under this definition, it is clear that Ismailis would not have been considered a separate race in the 19th Century. As a result, ARA is entitled to summary judgment on the claim that limitation of membership to Ismailis is a *per se* violation of § 1981.

Turning to Wilson's individual claim, the Court first notes that a claim of race discrimination under § 1981 focuses on Plaintiff's race, not the racial classification of the alleged discriminator. In addition, Plaintiffs' manner of classifying themselves is erroneous. Plaintiffs' race is Caucasian, not "non-South Asian" or "non-Ismaili."

■ Wilson's claim that he was discriminated against on account of his race because he is non-South Asian or non-Ismaili fails to state a claim for which relief can be granted. His race is not non-South Asian or non-Ismaili. No such races exist. Nonetheless, the Court will restate this claim to properly reflect a claim of dis-

---

9. The issue of whether Ismailis are a race for the purposes of § 1981 is a mixed question of law and fact. Although courts usually only consider questions of law at summary judgment, "summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Harbor Tug & Barge Co. v. Papai,* 520 U.S. 548, 554, 117 S.Ct. 1535, 1540, 137 L.Ed.2d 800 (1997). As the following discussion will demonstrate, only one conclusion is reasonable here.

crimination on account of Wilson's Caucasian race. To prove this claim Wilson relies on the following facts: (1) when he sent his faxed request for a membership application to ARA (but did not receive any response), ARA was aware of his name, which does not appear to be Indian or Pakistani, (2) when Wilson went to ARA's office, the personnel were able to observe that he did not look Indian or Pakistani, (3) ARA's membership application does not ask the applicant if he is an Ismaili, (4) ARA requires a copy of the applicant's driver's license along with the application (which would allow ARA to check a person's race using the photograph on the license), (5) no one at ARA asked Wilson his religion. [Doc. # 168 at 35–37, 59–60]. For all of these reasons, Wilson urges that there is an issue of fact as to whether he was excluded from membership because of his Caucasian race.

The Supreme Court has held that white persons are a protected group under § 1981. In *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court held that a white plaintiff who had been dismissed from his job had a cause of action under § 1981 for race discrimination, notwithstanding the statute's reference to white persons as the favored, comparator group. The Court looked to the language and congressional history of § 1981, and concluded that Congress had intended to protect whites as well as non-whites when the legislation was passed. However, it is also important to note that the contours of the protection afforded by § 1981 are heavily dependent on context. For example, in *Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), the Court held that a white applicant's rights under § 1981 were violated when she was denied admission to the University of Michigan's College of Literature, Science and the Arts. The Court's specific holding was as follows:

> We conclude, therefore, that because the University's use of race in its current freshmen admissions policy is not narrowly tailored to achieve respondent's asserted compelling interest in diversity, the admissions policy violates the Equal Protection Clause of the Fourteenth Amendment. We further find that the admissions policy also violates Title VI and 42 U.S.C. § 1981.

*Id.* at 275, 123 S.Ct. at 2430. In other words, plaintiff did not have an unqualified right to admission on the same basis as minority applicants. The point is that the elements required for § 1981 cases can vary according to context. While every successful § 1981 claim requires evidence of intentional discrimination, the manner in which that discrimination can be proven will vary depending on the nature of the alleged discriminatory acts. *Compare Benton v. Cousins Props., Inc.*, 230 F.Supp.2d 1351, 1370 (N.D.Ga.2002) (requiring plaintiff to identify "an apt comparator of a different race who was not subjected to the same harsh treatment with regard to the enforcement of a contract as was the plaintiff") *with Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1279–80 (11th Cir.2001) (in an equal protection and § 1981 case, holding that the plaintiff had standing to sue because his application was evaluated under a non-race neutral evaluation process).

■ Unquestionably, § 1981 requires proof of intentional discrimination. *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir.1991). Intentional discrimination may be proven through direct evidence of discrimination.[10] *See Bass*

---

10. "Direct evidence" means "... a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1111 (11th Cir.

v. Bd. of County Comm'rs, 256 F.3d 1095, 1103 (11th Cir.2001). However, it may also be proven when there is no direct evidence of discrimination. In an employment discrimination case brought by a minority plaintiff, intentional discrimination may be proven through the inferential mode of analysis approved in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff must make out a prima facie case to avoid summary judgment, and if the defendant provides a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must come forward with evidence which shows that the employer's explanation is a sham or pretext. *Id.* at 802–05, 93 S.Ct. at 1824–26. Thus, *McDonnell Douglas* is a two-way street: it gives the plaintiff latitude to prove discrimination through inferential analysis, but it also qualifies the plaintiff's entitlement to a trial on meeting the prima facie case and (if appropriate) the proof-of-pretext requirements.

The Eleventh Circuit applied a version of *McDonnell Douglas* in an employment discrimination case brought by a white plaintiff under Title VII and § 1981, where the defendant had an affirmative action policy which it claimed it had not followed in denying the plaintiff's application. *Bass*, 256 F.3d at 1105–07. Therefore, there is precedent for applying a *McDonnell Douglas* analysis in a reverse discrimination case. Also, Plaintiffs cite *Jackson v. Waffle House*, 413 F.Supp.2d 1338 (N.D.Ga.2006) to demonstrate that the *McDonnell Douglas* test may be used outside the employment context. In that case black plaintiffs alleged that the defendant's failure to serve them on the same basis as white customers constituted refusal to contract in violation of § 1981. The Court in *Jackson* used this modification of *McDonnell Douglas* to articulate the plaintiffs'

prima facie case: "(1) the individual is a member of a protected class; (2) the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute ... and (3) the defendant treated the plaintiff less favorably with regard to the allegedly discriminatory act than it treated other similarly-situated persons outside of the individual's protected class." 413 F.Supp.2d at 1355. The District Court found that Plaintiff Jackson had made out a prima facie case, and that Waffle House had failed to provide evidence supporting its proffered legitimate, nondiscriminatory reason; therefore, the District Court denied defendant's motion for summary judgment. *Id.* at 1358–59.

In response ARA points to *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228 (11th Cir.2000), where the Court of Appeals arguably rejected use of *McDonnell Douglas* in a non-employment discrimination case brought under § 1981. Specifically, the Court of Appeals noted:

> In contrast to a *McDonnell Douglas* case, a plaintiff in this non-employment discrimination case will have to demonstrate that (1) he or she is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.

*Id.* at 1239.

*Rutstein* was a case involving Jewish plaintiffs who sued claiming that Avis had denied them the right to make contracts for car rental on account of their race, ancestry, and ethnic characteristics. *Id.* at 1230. The question on appeal was whether the District Court had erred in certifying a class. *Id.* This Court does not construe *Rutstein* as holding that the *McDonnell Douglas* test can never be

2001). There is no direct evidence of discrimination in this case.

used outside the employment context in a § 1981 case. Rather, this Court believes the Eleventh Circuit found that because each individual plaintiff would be required to prove intentional discrimination (there having been no previous determination of class-wide discrimination) class certification was inappropriate.

Plaintiff has proposed the following elements for a prima facie case in this lawsuit:

> (1) [Plaintiff] belonged to a protected group (white, undisputed); (2) that he expressed interest in becoming a member of the ARA or, as a result of the employer's [sic] known bias, was dissuaded from undertaking such a futile act (undisputed) (footnote omitted); (3) that he was rejected (undisputed) and (4) after he was rejected, the employer [sic] continued to seek members from outside the protected classification.

[Doc. # 168 at 61–62]. In support of this proposal Plaintiffs cite *Walker v. Mortham*, 158 F.3d 1177 (11th Cir.1998). However, Plaintiffs have taken liberties with the version of *McDonnell Douglas* which was approved in *Walker*. The *Walker* version required the plaintiffs to show that they were rejected "despite their qualifications" and that after rejection the defendant either continued to attempt to fill the positions or in fact filled the positions with persons outside the plaintiffs' protected class. *Id.* at 1186. Moreover, in *Walker* the plaintiffs were black applicants and those outside their protected class were white. *Id.* at 1180. The fact that the employer had turned down a qualified minority applicant, while continuing to interview white applicants, gave rise to an inference of race discrimination based largely on the fact of historic discrimination against blacks. *Id.* at 1186.

The prima facie case as proposed by Plaintiffs is not apt under the facts of this case. This is not a case involving a single "opening" for a position. Wilson is not a minority applicant. Also, ARA does not "seek" applications. It receives applications from those who are interested in applying. The real question is whether all applicants are treated the same regardless of race. Also, the elements of a prima facie case as proposed by Plaintiffs are too weak. Under Plaintiffs' proposal all they have to show is that they are Caucasian, ARA did not admit them to membership, and that others who are not Caucasian have applied for membership. If this is all they are required to show, an unanswered prima facie case could not fairly be said to imply intentional discrimination on account of Plaintiffs' race.

A better, though not perfect prima facie case would be the following: (1) Plaintiff Wilson is Caucasian; (2) He applied for admission to ARA and was rejected while others outside the protected class were admitted; (3) In rejecting him ARA treated Wilson differently from similarly situated applicants from outside the protected (Caucasian) class. This prima facie case is imperfect because it is unclear whether, assuming Wilson was treated differently, it may properly be inferred that Wilson's race was the explanation for the different treatment, given that the decision-making was in the hands of immigrants of Indian descent. This question has not been addressed by the parties.

Nonetheless, in any event Plaintiffs have failed to show that Wilson was treated differently from similarly situated applicants outside the protected class and ARA is entitled to summary judgment for that reason alone. Under the facts of this case Plaintiffs have to show that ARA applied its membership criterion (being Ismaili) to Wilson but not to one or more applicants outside the protected class who were admitted. Plaintiffs have made no effort to do this. Instead, they point to the fact that ARA knew Wilson looked Caucasian

and had a Caucasian-sounding name, ARA did not ask Wilson whether he was Ismaili, and that ARA's application form did not ask the applicant's religion. But those considerations are not elements of the prima facie case. The fact that the alleged discriminatee's race differs from that of the alleged discriminator is not itself proof of intent to discriminate based on race. While the fact that the application form does not ask the applicant's religion raises a question mark, it is still Plaintiffs' burden to prove that ARA treated a Caucasian (Wilson) on the one hand and non-Caucasians on the other hand differently with respect to the criterion of being Ismaili. To do this, Plaintiffs must show *evidence* that this occurred. Plaintiffs have not produced or pointed to this evidence, which is missing. On the contrary, the only evidence in the record concerning the fate of applicants shows that two non-Caucasian applicants—a Mr. Singh and Rohit Patel—were denied membership because they are not Ismaili. Lakhani Deposition at 6–7, 35–37 [Doc. # 266].

Finally, the Court observes that if the evidence in the record were presented at a trial, the Court would be required to direct a verdict in favor of ARA. The evidence is insufficient as a matter of law to show that ARA intentionally discriminated against Plaintiffs on account of their race. ARA is entitled to summary judgment on Wilson's claim.

## C. *Plaintiffs' Motion for Class Certification*

Because the Court has granted ARA's motion for summary judgment, there is no need to rule on Plaintiffs' motion for class

certification. The motion will be dismissed.

## III. *Conclusion*

Defendant ARA's motion in limine to exclude the declaration of Professor John Tehranian is GRANTED [Doc. # 205]. Plaintiffs' motion in limine to exclude the testimony of Dr. Richard Martin is DENIED [Doc. # 299].

Plaintiffs' motion to supplement their summary judgment response is DENIED [Doc. # 284, 285]. Defendant ARA's motion for summary judgment [Doc. # 122] is GRANTED as follows: Defendant ARA's motion for summary judgment is GRANTED both as to the claim that ARA's membership limitation to Ismaili Muslims is a *per se* violation of § 1981 and as to Wilson's claim that rejecting his application violated § 1981' as to Potts' claim of discrimination ARA's motion for summary judgment is GRANTED. In light of these rulings, ARA's motion for partial summary judgment to preclude punitive damages is DISMISSED as moot [Doc. # 295].

Plaintiffs' motion for class certification is DISMISSED as moot [Doc. # 278]. Plaintiffs' motion to reconsider this Court's order granting in part a motion to compel class-related discovery is also DISMISSED as moot [Doc. # 292].[11]

It appearing that Plaintiffs' claim against Defendant Pepsi Bottling Group remains pending, Plaintiffs and Pepsi are directed to file a proposed consolidated pretrial order no later than April 30, 2009.

---

11. In addition, Pepsi stated in its response to Plaintiffs' motion for reconsideration that Plaintiffs' statement that they could not identify the race of each putative class member, beyond non-South Asian and/or non-Ismaili, was an adequate response to Pepsi's discovery request. [Doc. # 297 at 8–9]. Accordingly, while Plaintiffs' motion for reconsideration has been dismissed, no further action is required from Plaintiffs in regard to the order granting Pepsi's motion to compel.